## H. H. THOMAS vs. WM. THOMAS, ET AL.,

**Wills—Mental Capacity—Undue Influence.**

> Walter Thomas, over eighty years old, desiring to make his last will, applied to his counsel for legal advice as to a disposition of his prop-erty. Pursuant thereto, he sent for his son, William, who was living in Illinois, and on his arrival, made, executed and delivered, according to pre-arranged plans, his will, in which the son William was a bene-ficiary. The father was infirm, had lost his sight, and temporarily at times, prior thereto, had strange delusions as to his own whereabouts, and his mental capacity had greatly deterioated. It was proven that on the day of making his will, he was perfectly rational, and transacted business of great and grave importance with several gentlemen. His will was made according to carefully arranged plans, his son William not knowing about the matter until receipt of letter requesting his presence, and used no persuasion, or even a suggestion to his father as to any provisions in the will. **Held,** that the donor was of sufficient mental capacity to make a valid and binding will, and no undue in-fluence is shown to have been exercised over him.

APPEAL FROM ALLEN CIRCUIT COURT.

May 30, 1868.

OPINION OF THE COURT BY JUDGE PETERS:

The three grounds relied upon to vacate the contested docu-ments signed and acknowledged by Walter Thomas, dec'd, on the 15th of June, 1863, will be considered in the numerical order in which they are presented in the briefs of appellant.

First. That Walter Thomas at the date of said instruments had not sufficient mental capacity to make and excute a contract binding and valid in law, and to dispose of his property in a sensible manner.

At the time the contested papers bear date, Walter Thomas was over eighty years of age, in feeble health, and was very nearly, if not totally, blind; in earlier manhood, and up to the time when bodily afflictions came upon him, he was a man of vigorous intellect, possessed of more practical good sense and intelligence than falls to the lot of most men, which had in days past won him honorable distinction among his fellow citizens. The infirmities of four score years, and the disease of the eyes, which deprived him of his sight, had brought the strong man down to comparative helplessness, and dependence upon others, that he had not known in other, and brighter days.

Shut out from the light of this world, and the goal of the pursuits and pleasures of this life having been reached, his thoughts were naturally directed to the contemplation of the best, and most equitable, mode of disposing of what remained of the earnings of his life. And to aid him to arrive at a proper conclusion on the subject, he applied to a man distinguished for his legal ability, and therefore every way qualified, to advise him, which he must have done with the more confidence because an uninterrupted friendship had existed between them for forty years. His objects and intentions were unreservedly expressed and explained to this friend, advice given by him, and Thomas then *decided* to act upon it, and directed his friend to write to his son William, one of the appellees, residing in Illinois, to come to him, in order to complete the arrangement.

In this there was evidence not only of prudence, but of sound judgment and good sense, in view of his relations as husband and father, and his obligations as such.

It is true that the two family physicians testify as to the physical and mental condition of Walter Thomas before, at, and after, the date of said instruments. One of whom states that the deceased

"was not suffering for three or four years next preceding his death from any internal organic disease, that he could detect, but a general loss of vigor of the functions of the whole organism, and as the brain is not only one of the most important organs of animal life, but is said to be

the seat of the mind, hence in the loss of vigor of the functions of the brain the mind suffers;"
and they both are of opinion that he was not from the infirmities, of old age, and decay of intellect, of sufficient mental capacity to transact important business, and to make a prudent disposition of his property, at the date of said instruments.

Several other witnesses state facts showing that the memory of decedent had greatly failed, and that he at times labored under strange delusions, at one time imagining that there was an excrescence on his lips, at other times that there was a preternatural substance in his mouth, which would prove fatal to him, if it could not be removed, and at other times he would imagine that he was away from home, and could not be comfortable until he could be taken back, and no persuasion or assurances of his friends, and those around him, could convince him of his error. But on the day the instruments were executed, three gentlemen were at his house, saw him, and conversed with him. One of them, a Mr. Cox, went there to get his deposition to be used as evidence in a suit to which he was a party; his deposition was taken. Cox and Mansfield, the examiner who wrote out the deposition, both prove he fully comprehended the business he was engaged in, gave a comprehensive, connected, clear and intelligent statement of the facts to which he was deposing, and Cox says a truthful one, stating the facts just as he had narrated them to him years before; that he had called to see him the evening before to inform him he desired to take his deposition the next day, and he then found him intelligent, as his conduct and conversation showed. Mansfield proves he had known him from 1839; that he was then a man of strong mind; that when he took his deposition for Cox he comprehended the questions propounded to him and answered them readily and intelligently, and although feeble in body, he appeared as rational as any man of his age he ever saw, and exhibited no want of intellect that he could detect.

Carpenter, the clerk of the Allen county court, proves he knew the decedent well, lived within 200 yards of him for two years before his death, took decedent's acknowledgement of the deeds in question, and on the day they were acknowledged, that from his long acquaintance with decedent, he was at the time competent to the transaction of the business. There is no evidence in conflict with the evidence of these witnesses as to the mental condition of Walter Thomas on the day of the signing and acknowledging

of said instruments, and we are constrained to conclude, that although the fading tabernacle of Walter Thomas was soon to be forever removed from the sight of men, the deeds are the offspring of a mind fully able to comprehend the business it was engaged in, the relations and obligations the donor bore to others, and his duties to them.

On the *second* ground or undue influence but little need be said; there was no possible chance for such influence to be exercised by any one except William Thomas—there is no evidence that· he ever uttered a word or made an effort to induce his father to dispose of his property in any way whatever. The wish had been expressed by the decedent to make disposition of his estate in a way to meet his views to Judge Underwood when William Thomas was in another state, and the whole subject discussed, considered, and finally concluded upon, before he knew anything of it, and the first information he had on the subject was in a letter addressed to him by Judge Underwood, in which his father's wishes, and the mode agreed upon, as the most practical, to carry them out, and he was requested to come to the residence of his father to con- summate the business; he came, and it was attempted to be done, through him, precisely on the plan suggested by Judge Under- wood, and adopted by his father in his absence, and wholly with- out his instrumentality. That ground, therefore, is not made out. Nor can the last be made more available. The provision made by decedent for his wife was at the time reasonable and just, in view of the condition of his children, and the claims they had upon his bounty.

The precise value of the personal estate given to his wife is not definitely shown, but with the $300 in money which is given her, may be assumed to amount to $800; the annual value of the real estate, in and near Scottsville, may be estimated at $200, and the annuity of $60 secured to her will produce to her more, annually, than the one-third of the whole estate of her husband, while the real estate is continuing, and of a permanent character, the money is less secure, and more difficult to manage. But if she could have been able to have retained the slaves given to her, would have been much gerater than the one-third of the whole estate of the decedent, and we have already seen her annual income is now as much as it would have been on the one-third of the whole, to which she would be entitled. Under these circumstances, and

in view of the fact that she had no children by her marriage, with decedent, and that he had a number of children and grand-children, some of whom were very poor, we cannot say the deeds are within the prohibition of the statute.

Wherefore, the judgment is affirmed.

*Dickey, Leslie & Botts, Gatewood, for appellant.*

*Underwood, for appellees.*