## Frazie's Executrix v. Frazie, et al.

(Decided December 12, 1919.)

### Appeal from Breckinridge Circuit Court.

1. Wills—Mental Capacity—Hypothetical Questions.—A testamentary paper which is not irrational and which makes a reasonable and natural disposition of the estate of the testator, and which has been duly proven, will not be set aside upon the ground of mental incapacity of the testator where the only evidence on that point is that the testator was eighty-five years of age, almost deaf, quite blind and sometimes cried or appeared fractious and gruff; while the evidence for the propounder shows beyond question that the testator was a man of industry and activity, and had through his business acumen accumulated a fortune of more than $100,000.00, and had always been regarded the best business man in his town, and this though three expert witnesses in answer to the general hypothetical question answered that they did not believe that a person who acted as set forth in the hypothetical question had mental capacity sufficient to make a will.

2. Wills—Mental Capacity.—The opinion of non-expert witnesses that the testator was incapable mentally of disposing of his property according to a fixed purpose of his own, is entitled to little or no weight where they have slight opportunity to observe the manner of the testator or to listen to his conversations, and relate no facts which tend to support their opinion.

CLAUD MERCER, R. F. PEAKE and EDWARDS, OGDEN & PEAKE for appellant.

MOORMAN & WALLA, ERNEST WOODWARD & JOHN P. HASWELL and H. L. JAMES for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

The last will of Frank Frazie, who died on the — day of January, 1918, and which will was duly probated in the Breckinridge county court on the 28th day of January, 1918, reads as follows:

"April 16th, 1916.

"I, Frank Frazie, of Cloverport, Kentucky, declare this instrument to be my will.

"(1) I will, devise and bequeath all of my estate, real, personal and mixed, jointly to my wife and son, Fred W. Frazie, and at my death should either be dead, then the survivor shall have the entire estate.

"(2) I request that no inventory of my estate shall be requested of my executor, because of the faith I have in the integrity of my son, Fred W. Frazie, who I nominate executor of my estate and I request the county court where my will shall be probated, not to require any bond of him as such executor.

"In witness whereof, I have hereunto signed my name to this will, the terms and conditions of which are written as dictated by me all of which I fully understand, and I have signed same in the presence of Wilbur Chapin and Claude Mercer, each of whom, signed his name hereto as attesting witnesses in my presence.

"F. FRAZIE."

On the 4th of September, 1916, Frazie executed the following codicil:

"September 4th, 1916.

"My son, Fred Frazie, having died since I made my will in April, 1916, I desire to make this codicil to my said will:

"Under the terms of said will my wife is now the sole legatee of all my property fee simple, which provisions I now reaffirm.

"I now appoint and request the county court of Breckinridge county to confirm by its appointment, my wife to the executrix of my estate, and that she be permitted to qualify without giving bond, and I further request that no inventory or appraisement of my estate shall be requested or made of her.

"F. FRAZIE."

Frazie was about eighty-five or eighty-six years of age at the time of his death. He left a wife who qualified as executrix under the will, but no children survived

him, although at the time of the making of the will his son, Fred, then a man of mature years, was engaged in business with the testator. This son died without issue before the making of the codicil. A daughter was also born to him but she died in infancy. After the will and codicil were probated, on January 28, 1918, and the widow appointed as executrix, Fred W. Frazie and the other appellees herein, all nephews and nieces of the deceased, instituted this action in the Breckinridge circuit court to have the will declared invalid. Issue being joined, a jury trial was had, resulting in a verdict finding both the will and codicil not to be the last will of Frank Frazie. Motion and grounds for a new trial being overruled, a judgment was entered declaring the two papers named not to be the will of the testator. The widow appeals.

While there are several grounds set out in the motion and grounds for a new trial, but one is urged here for reversal of the judgment, namely, failure of the trial court to sustain the motion of appellant for a peremptory instruction to the jury to find in her favor, which is but to urge that there was not sufficient evidence of mental unsoundness on the part of the testator, or of undue influence exercised over him by others to have warranted the trial court in submitting the case to the jury. Counsel on both sides have prepared and caused to be printed able and extended briefs, which are of great assistance to the court in the determination of the questions presented. The contestants introduced thirty-five witnesses, of which number three were doctors, the others laymen. Neither of these doctors was the personal physician of Frank Frazie, nor had they been closely associated with him, and frankly admit that they had little conversation with him for several years before his death. In fact, one of them, Dr. Stirman, never saw Mr. Frazie. To each of them however was propounded the customary hypothetical question employed in will cases in order to elicit the professional opinion of medical men, and each gave it as his opinion on the state of facts included in the hypothetical question that Mr. Frazie was mentally incapable of taking a rational survey of his property, knowing the natural objects of his bounty, or of disposing of his property according to a fixed purpose of his own. In the hypothetical question

are included a good many alleged facts which are not borne out by the evidence, or at least but slightly hinted or vaguely proven. Had all the alleged facts included in the hypothetical question been substantially sustained by the evidence, there would have perhaps been enough evidence to have justified the trial court in submitting the question of the mental unsoundness of the testator to the jury, but we doubt whether there was sufficient evidence, even in accepting all of the statements contained in the hypothetical question as true, to have sustained the verdict in the light of all the evidence heard upon the trial. Aside from the evidence of the doctors, which is chiefly confined to their opinion as men learned in their profession, appellees called several non-expert witnesses, all of whom were personally acquainted with the testator and some of whom were associated with him more or less up to the time of his last sickness. A few of them however had no intercourse with him more than a casual meeting on the street or about town, with little or no opportunity for conversation with him, or to observe his acts and conduct. A large number of these non-expert witnesses expressed no opinion whatever as to the testamentary capacity of Frazie at the time of the making of the will and codicil, while others did give their opinion.

Take for example the witness, Joe Morrison, called by contestants. He was asked:

"Q. Where do you live? A. Cloverport. Q. How long have you lived in Cloverport? A. Eighteen years. Q. Did you know Mr. Frazie? A. Yes, sir. Q. How long have you known him? A. I have been acquainted with Mr. Frazie a good while before I moved there. Q. About how long? A. Twenty-five or thirty years. Q. Did you trade with him through that quarter of the country? A. Not much. Q. During the eighteen years you have been living in Cloverport, how frequently did you see him? A. Every few days. Q. Did you have any occasion to hear him talk and observe his behavior? A. Some. Q. When you first knew him was he a good business man or not? A. Well, I thought so. Q. Did you notice any change in him in the later years—the last four or five years of his life? A. I thought there was a change. Q. Tell the jury what you saw in that respect. What change did occur in the man in the last four or five years—just

describe the change as you saw him? A. I might say the one change I would observe, he seemed fractious. Q. More than he had ever been before? A. I thought so. Q. How about his conversation during the last four or five years—did you notice any change in that? A. I thought there was some change. Q. What made you think that? Tell the difference you observed? A. The man seemed to have grown gruff and short spoken. Q. Did you ever notice him crying? A. No, sir. . . ."

Contestants also called Thomas Miller, who said he lived six or eight miles west of the county seat, and that he had known Mr. Frazie for about thirty-five years. He was asked:

"Q. Fifteen or twenty years ago what sort of a man was he? What sort of mind did he have? A. We thought he had good mind at that time. Q. Above the average in your opinion, smart business man? A. Yes, sir, in his business. Q. Have you noticed any change in him? Tell when and all about it? A. I noticed a right smart of a change in the last few years. Q. How did that change manifest itself? A. The last time I saw him he did not act like he used to; he just seemed to be feeble-minded, or that there was something wrong with him. I do not know what it was. Q. Was he able during the last two or three years to talk about one subject, or keep his mind on one subject or not? A. He was not. Q. He did not do that? A. No, sir; I don't know if he could or not, but I suppose not."

One or two other witnesses for contestants testified that Frazie cried or near-cried about the sickness of a favorite cow which he owned, and on other occasions acted like he was about to cry about distress which he declared was impending or which his debtors from whom he attempted to collect rents or other claims said was afflicting them. He was also shown to be almost blind and quite deaf. In addition to this he had been crippled by a fall some years before, all of which put him at a great disadvantage and caused him to appear quite feeble and unable to take care of himself. In reading the testimony for appellees concerning the mental unsoundess of Frazie, we are forced to the conclusion that all or nearly all the non-expert witnesses were at a great disadvantage because they had not enjoyed intimate association with the testator and were not well prepared to either describe his manner or relate his conversations except in frag-

ments. The few facts which they relate are so disconnected and many of them so irrelevant as to reflect little light upon the real mental condition of Frazie. Their opinions, therefore, based upon these probativeless facts are entitled to very little weight. It is a well established rule, often recognized by this court as well as other courts of last resort throughout this country, that opinion evidence in will cases, given by non-expert witnesses, must in order to have probative value be based upon facts which, when considered, give color to the opinion expressed by the witnesses. The mere expression of opinion of a non-expert witness as to the mental unsoundness of the testator not accompanied by a statement of facts which support it, is entitled to little or no consideration. The value of such testimony rests entirely upon the substantive relative facts disclosed by the testimony. Clark, et al. v. Young, Ex., 146 Ky. 377; Bush v. Lisle, 89 Ky. 393; Hildreth v. Hildreth, 153 Ky. 601; Schrodt v. Schrodt, 181 Ky. 179.

In the Schrodt case, *supra,* we said:

"It will be observed that the only evidence of mental incapacity consisted of the opinions of non-expert witnesses based on the fact that the testatrix permitted her mind to wander from the subject under discussion and that she did not maintain what the witnesses considered a good fire or provide herself with nourishing food. We have frequently written that where the facts relied on are insufficient to show mental incapacity, the opinions of non-expert witnesses based thereon are likewise insufficient for that purpose."

The executrix and sole devisee, Mrs. Frazie, called about twenty witnesses, among them Dr. Clark, a personal physician of the deceased; the others, aside from the widow, Mrs. Cornelia Frazie, were business men and women who were intimately associated with Mr. Frazie for some years next before his death, and who were in the best position of all living people to know the actual mental condition of the testator at the time as well as before and after the making of the will and codicil. Among this list is the personal attorney of Mr. Frazie, who prepared both of the testamentary papers and who frequently consulted with his client concerning business matters along about the time of the making of the papers and for some months before. This attorney, Mr. Claude Mercer, says that he prepared the will at the offices of

Mr. Frazie in Cloverport, and that it was dictated by Mr. Frazie. These are his words:

"Mr. Frazie told me what he wanted done with his property. He said he wanted his wife and son Fred to have it all, and if one died before he died (Frazie), the survivor should get it all." He then says that no one was present at the making of the will except he and Mr. Frazie until they called in a witness after the writing had been prepared. In answer to the question as to whether in the opinion of Mr. Mercer the testator had mind and memory sufficient to know his estate and of what it consisted, to take a comprehensive view thereof, to know his relatives, the natural objects of his bounty and his duty to them, the witness answered, "He did." He was then asked:

"Q. And to dispose of that estate according to a fixed purpose of his own? A. He did. Q. Is there any doubt in your mind about that? A. None whatever."

Mr. Skillman, an ex-bank president and business man, eighty-six years of age, was called and testified that he had known Mr. Frazie intimately for sixty years. Mr. Frazie was a patron of the bank of which Mr. Skillman was cashier and president for more than forty years. He saw and conversed with Frazie frequently both at the bank and as a customer at the Frazie store. Coming down to the last years of the life of the testator, these questions were asked:

"Q. Take the last five or six years before his death (Frazie's), did you see him often during that period? A. I did, sir. Q. Did you have any business transactions with him? A. His regular business at the bank was all. Q. During that period did he not know approximately what his balances were in the bank? A. He did. Q. Your long acquaintance and business connection with him, in your opinion did he have on the 15th of April, 1916, mind and memory sufficient to know what his estate was, approximately, and the value of it? A. I believe he did. Q. Did he have mind and memory sufficient to know his relatives, that is the persons who were the natural objects of his bounty and his duty to them. A. I think so. Q. Did he have mind and memory sufficient to dispose of his estate according to a fixed purpose of his own? A. I believe he did."

Mr. Bowmer who had known Mr. Frazie and been associated with him in business for fifty-five years, testi-

fied that he saw Frazie very frequently until after the making of the will and codicil, and that in his opinion the testator on April 15, 1916, had mind and memory to know the natural objects of his bounty and his duty to them, and to know the character and value of his estate, and to dispose of his estate according to a fixed purpose of his own. When asked upon what he based his opinion, Mr. Bowmer said that Mr. Frazie appeared to be directing his business and to know a great deal about it, although he was most blind and could scarcely recognize people. He further testified that he frequently talked with Mr. Frazie upon general subjects and that his conversation was rational. He expressed the opinion that Mr. Frazie was rational and competent to dispose of his property by will at the time he executed the will and codicil.

His confidential secretary and bookkeeper, Miss Pauline Mooreman, was also called by the propunders of the will and she deposed that she had been in his employ working in his store and office for about eight years, and during that time had been intimately associated with Mr. Frazie in business and constantly conversed with him about business matters, and often the details of his business. With reference to the year 1916, when the will and codicil were made, these questions were asked:

"Q. About how often do you think you were on duty for Mr. Frazie during the year 1916? A. I think I can safely say I was there all the time. Q. Did you see Mr. Frazie every day or not? A. Yes, sir. Q. Did you talk with him? A. Yes, sir. Q. Mr. Frazie made a will on the 15th of April, 1916. State whether or not on the 15th of April, 1916, in your opinion Mr. Frazie had mind and memory enough to know the natural objects of his bounty and his duty to them? A. He most certainly did. Q. State whether or not on the day mentioned in your opinion Mr. Frazie knew the nature and character of his estate, was able to take a rational survey of his estate? A Yes, sir; he was. Q. State whether or not on the day mentioned in your opinion Mr. Frazie had mind and memory sufficient to enable him to dispose of his property according to a fixed purpose of his own? A. Yes, sir; he did."

She remembered the day on which the will was made and that she had had a conversation with him on that day at the office, and also on the day the codicil was made,

and she expressed the opinion that "he did have mind enough to make his own will and to know his own mind." It is clear from Miss Mooreman's evidence that she was more intimately acquainted with Mr. Frazie and his business affairs than any one, unless it was his wife, and the many facts which she related concerning how the testator handled the routine of his business from day to day throughout the year 1916 fully bore out her opinion that he had sufficient mental capacity to dispose of his property by will according to a fixed purpose of his own.

Many other business associates of Mr. Frazie gave testimony of like character, all expressing the opinion that he, while old and feeble physically, was yet mentally capable of making a rational survey of his property, recalling his relatives, the natural objects of his bounty, and of disposing of his property according to a fixed purpose of his own.

His personal physician, Dr. Clark, who has had several years' experience as a physician in an institution for the treatment of nervous and mental trouble, stated that he had been attending Mr. Frazie as his physician for several months before his death. He treated him for bile trouble and had frequently conversed with him not only about his physical ailments but about business matters. In telling about what they talked, the doctor said "general topics especially before I began treating him I used to stop in his office down there next to the post office and sit down and talk with him sometimes for an hour. I found him very interesting in talking to about history of the county and condition of the people and everything of that sort."

"Q. After you began treating him what was the character of your conversation? A. Along the same line except that I talked to him then quite a good deal more about his physical condition. Q. Did he have any trouble with his eye sight? A. Yes, sir; his eye sight was bad. . . . Q. During the entire time that you knew Mr. Frazie what was his mental condition? A. I considered it very good. Q. Taking into consideration your talk with him and your examination and treatment of him, could you express a medical opinion as to whether on the 15th of April, 1916, Mr. Frank Frazie had mind and memory sufficient to know his estate, of what it consisted, to make a comprehensive view thereof, to know his relatives, the natural objects of his bounty, and his duty to them and

to dispose of his estate according to a fixed purpose of his own? A. If he was in as good mental condition as when I knew him I would certainly say yes. He gave no history to me as having been in any other mental condition. Q. In talking with him did you obtain from him a history of his physical condition for some years prior to that time? A. Yes, sir. Q. State whether or not there was anything in that physical history that indicated any mental derangemnet or loss of mentality? A. No, sir. . . . Q. Did you learn from him whether he had been injured? A. Yes, sir; he had had an injury to his hips in his past life. Q. Did that in any way affect his mental powers? A. No, sir. Q. Did the condition of his eyes in any way affect his mental powers? A. No, sir. . . . Q. Describe to the jury the mentality of Mr. Frazie from the time you knew him? A. In my conversations with him I found him very interesting to talk to on account of his good memory, and I considered he had unusually good judgment of people living in the county and I took advantage of that to gather information as to the character and standing and otherwise of the people. He was quite interesting to talk to and I considered his mind for his age unusually good.''

Old age alone does not disqualify one from disposing of his property by will. No court has ever so held, yet contestants have little else to entitle their cause to consideration than the extreme old age of the testator and his defective hearing and eyesight, added to his decrepit physical condition which is largely due to his broken hip or limbs. As one grows older his sensibilities are dulled, his eyesight dimmed, and his hearing less acute, but this is not mental unsoundness nor are such facts alone entitled to be considered as tending to prove testamentary incapacity.

The majority of the witnesses called by the propounder not only expressed the opinion that Mr. Frazie had sufficient mental capacity to make a will at the time of its date, but that he was capable mentally of taking care of himself in all business transactions. His fortune of something more or less than $100,000.00 was the result of his own intelligence, industry and business astuteness. He had the reputation of being and was regarded by the citizenship of Cloverport as one of the best, if not the best, business men in that city for almost half a century.

The people with whom he dealt had no doubt as to his ability to manage and control his affairs and they all looked upon him as a man of unusual business acumen. Of course in his last days he was so enfeebled physically and embarrassed by the loss of his sight and hearing that he could have but little intercourse with the public generally. But to his intimate friends and close business associates he displayed in conversation and in business transactions much of the old skill and adroitness which had characterized his business life and made him easily the leader in his line in his county.

A will can not be set aside without evidence showing testamentary incapacity or undue influence. Every presumption is in favor of the probated testamentary paper, and such paper will not be set aside or adjudged invalid except upon evidence sufficient to overturn such presumption, and to show either mental incapacity on the part of the testator or the exercise of undue influence over him.

The verdict in this case is flagrantly against the weight of the evidence, and the trial court should have granted appellant a new trial. We have held in more than one will case that where the evidence for the contestants is largely made up of opinions which are not based upon proven facts, and is otherwise vague and unsatisfactory, and the evidence for the propounder is direct, certain and convincing and the instrument itself is rational and natural, the verdict of a jury finding the instrument not to be the will of the testator should be set aside and a new trial granted even though there is a scintilla of evidence to support the verdict, and in Clarke v. Young, Ex., 146 Ky. 377; Bush v. Lisle, 89 Ky. 393; Hildreth v. Hildreth, 153 Ky. 601; Cecil's Executors, et al. v. Anhier, et al., 176 Ky. 198; Schrodt v. Schrodt, 181 Ky. 172, we held that even though there was a scintilla of evidence to sustain the claims of the contestants the judgment should be reversed with directions for a peremptory instruction if on a second trial the evidence was substantially the same as on the first trial. Here the will is entirely rational on its face. The testator had no children or grandchildren. His wife had been his lifelong companion, faithful and true. A large part of their early fortunes came from her father's estate. Frazie used her money as his own and mixed and mingled it with his estate. In 1912, long before the time appellees claim his mind failed, Frazie made a will giving all of his property

to his wife who is appellant here. At that time his son was living but the son's wife had sued him, or was threatening to sue him for divorce and alimony, and Frazie fearing that his disgrunted daughter-in-law might get part of his estate if he should suddenly drop off, made the will in 1912 giving his entire estate to appellant. After the divorce suit was settled he made the will in contest, whereby he gave his entire estate to his son Fred and appellant jointly, naming his son as executor. No one could question the rationality of such a paper. To whom could he have given his property to have better shown his mental soundness than to his wife and son? Shortly after the execution of this will the son died, leaving no child, and the father remembering distinctly how he had disposed of his property in his will, called in the same attorney and explained to the attorney that he desired to make a codicil to his will giving all of his estate to his wife and making her executrix instead of the son who was named in the original paper. The attorney suggested to Frazie that no such writing was necessary in order to give the whole of the estate to the wife because the original paper provided that in case of the death of either of the devisees "the survivor shall have the entire estate." Frazie insisted, however, that he wanted his wife to be executrix without bond and without being required to file an inventory of his estate, and for that reason he desired to make a codicil. So, following the direction of Frazie, the attorney wrote the codicil.

This codicil was dictated by Frazie and was written at his urgent request and in spite of the suggestion of the attorney that it was unnecessary, which proves beyond controversy that Frazie had a mind of his own and a fixed purpose to dispose of his property according to a plan of his own. He could not even be influenced by his attorney nor turned from his purpose to make certain and definite that which he feared might be indefinite and uncertain in his will; and further, to confer upon his wife the powers incident to an executrix in place of his deceased son. Considered in light of all the facts, and circumstances both the will and the codicil are unquestionably rational instruments.

There was a total absence of evidence of undue influence.

On another trial the court should not submit the case to the jury unless in addition to that appearing in the

record the evidence of mental unsoundness offered by the contestants is fortified by facts of a probative nature, or there is substantial evidence of undue influence.

Judgment reversed for proceedings consistent with this opinion.