## Robinson v. Paxton, et al.

(Decided October 16, 1925.)

### Appeal from Lincoln Circuit Court.

1. Courts—Court and Not Jury Proper Tribunal to Determine Issue of Fact Affecting Jurisdiction of Court to Hear and Try Case.— Court and not jury proper tribunal to determine issue of fact affecting jurisdiction of court to hear and try will contest.

2. Appeal and Error—No Motion for New Trial of Jurisdictional Fact Necessary Before Bill of Evidence Thereon Can be Included in Record on Appeal.—Motion to strike from record on appeal bill of evidence containing testimony heard upon objections to jurisdiction because no motion for new trial thereof had been made before circuit court held without merit, such requirement applying to new trial on merits of cause and not to reconsideration of interlocutory order or decisions.

3. Appeal and Error—Bill of Evidence Heard on Jurisdictional Issue Need Not be Made and Filed as Prescribed by Code with Reference to Final Trial of Cause on Merits.—A bill of evidence heard upon a jurisdictional issue need not be made and filed as prescribed by Code with reference to final trial of cause on merits, and if such evidence is properly filed within prescribed time and in prescribed manner after final trial it is sufficient, and may be considered on appeal in determining issues involved.

4. Appeal and Error—Where Appellant Filed Bill of Exceptions, Containing Certificate of Judge as to Correctness of Testimony on Jurisdictional Fact, Within Time Allowed by Court After Trial on Merits to Prepare Bill of Exceptions, it was Properly in Record.—Where after judgment and verdict on merits contestant filed bill of exceptions, in which court certified to correctness of transcript of testimony heard on trial of jurisdictional fact, within time allowed by court to prepare bill of exceptions, the evidence on jurisdictional fact was properly before court on appeal.

5. Wills—Will Must be Probated in County of Testator's "Legal Domicile," and Not in Place where he was Merely Temporarily Abiding.—Will must be probated in county of testator's "legal domicile," and not in place where he was merely temporarily abiding.

6. Domicile—Manner in which "Legal Domicile" Arises Stated.— Every one has a "legal domicile," and its acquisition arises either from facts over which possessor has no control, such as from resi-

dence with parents, or it arises voluntarily from fact of actual residence, coupled with intention to make it either permanent, or presently fixed with only floating intention to change it.

7. Domicile—Legal Residence, when Once Acquired, Remains Such Until Changed in Legal Manner—Burden on One Asserting Change to Prove it.—Legal residence, once acquired, remains such until changed in legal manner, and burden is on one asserting change to prove it.

8. Domciile—Fact of Actual Domicile, Plus Intention to Make it Permanent for Indefinite Time, Necessary to Change "Legal Domicile."—Fact and intention are both necessary elements in acquisition of a legal domicile, i. e., fact of actual domicile plus intention to make it permanent for indefinite time; such indefinite intention being sufficient, notwithstanding there may be further entertained purpose to change domicile at some unfixed time in the future, dependent upon changed conditions which may or may not appear.

9. Estoppel—Listing by Brother of Testator's Property for Taxation Held Not to Estop Brother from Denying County where Taxes were Listed was Testator's Domicile.—Acts of brother of testator before latter's death in listing testator's property for taxation held not to estop him in contest of will from urging that county where taxes were so listed was not county of testator's domicile, since such acts were evidence merely of his opinion as to true domicile.

10. Appeal and Error—Finding of Trial Court that Testator Intended to Change Legal Domicile Not Disturbed, in View of Evidence of Actual Change, and Absence of Testimony that Change was Only Temporary.—Finding of court that testator intended to change his legal domicile from one county to another when he moved both person and belongings to his sister's residence will not be disturbed, in view of evidence of actual change, and absence of testimony showing that such change was to be only temporary.

11. Wills—Will Held Not of Such an Inequitable Nature as to Show Undue Influence.—Where testator divided property equally to brothers and sisters, but provided that if any died without issue amount received by him or her from estate was to be divided equally among kindred, such will was not of such an inequitable nature as to show undue influence because of fact that contestant had no children.

12. Wills—Bodily Sickness or Sub-Normal Mentality Does Not Preclude One from Devising His Estate.—The fact that one is bodily sick or subnormal mentally does not disqualify him from devising his estate.

13. Wills—Evidence Held to Show that Destruction of Will by Contestant was Never Consented to by Proponents.—In will contest, where contestant claimed that he destroyed testator's will with consent of proponents because testator was mentally incapacitated, held that evidence preponderated to effect that neither of proponents consented to destruction of will.

14. Wills—Verdict of Jury that Testator was Mentally Capable of Making Will Not Disturbed in View of Evidence.—In will contest, finding of jury that testator had mental capacity to execute a will not disturbed on appeal, in view of evidence that accused was merely suffering from low physical vitality due to disease.

15. Wills—Actual Exercise of Undue Influence and Not Merely Opportunity to Exercise it Must be Shown to Avoid Will.—In order to show undue influence on testator, something more than an opportunity to exercise undue influence must be shown, and evidence must be adduced showing that undue influence was actually exercised.

16. Wills—Evidence Held Not to Require Submission to Jury of Question of Undue Influence.—Where will was equal to all beneficiaries provided they occupied status of parents to living children, and where it was shown one proponent had discouraged any attempt by testator to favor them because of their having children, such evidence did not require submission of the case to the jury on question of undue influence.

HENRY JACKSON and J. E. ROBINSON for appellant.

P. M. McROBERTS, L. L. WALKER and K. S. ALCORN for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

J. Y. Robinson, a bachelor 52 years of age, died at the home of his sister, Mrs. Mary R. Paxton, in Stanford, Lincoln county, Kentucky, on September 3, 1920. He was survived by two brothers, the appellant, J. F. Robinson, and the appellee, George D. Robinson, and by one sister, the appellee, Mary R. Paxton, with whom he lived at the time of his death. The two latter were married and each had living children, while the appellant, J. F. Robinson, was married but had no children, and because of the age of his wife there was no probability that he would ever have any by her. After decedent's death his brother, George R. Robinson, and his sister, Mary R. Paxton, offered for probate in the Lincoln county court a paper purporting to be his last will and testament. Its probate was resisted by appellant upon the usual grounds of mental incapacity of the testator and undue influence exercised on him, and he also vigorously contested the venue of the probate proceedings, upon the ground that the alleged testator at the time of his death was a legal resident of Garrard county, and that only the county court of that county had jurisdiction to probate his will. The county court of Lincoln county heard evidence upon the issue as to testator's residence

and adjudged that his residence at the time of his death was in Lincoln county and proceeded to take jurisdiction of the probate proceedings. Thereupon appellant filed his petition in the Lincoln circuit court and sought a writ of prohibition against the county judge to enjoin him from further proceeding in the cause upon the alleged grounds that he was endeavoring to do so without jurisdiction, but which proceeding was rightfully dismissed, since the county court evidently had the right to determine the facts necessary to its jurisdiction. Hearing was then had before the county court upon the two issues involving the merits of the contest and each of them was adjudged against appellant and an order entered probating the paper as the testator's last will and testament. From that judgment appellant appealed to the Lincoln circuit court, and at the February, 1922, term a trial was had of the jurisdictional fact as to testator's residence, and the testimony introduced at that trial was taken by the court's stenographer and afterwards transcribed. The presiding judge of the circuit court did not render a decision of that issue at that term, but took it under consideration until the following May term, when he adjudged that the decedent died a resident of Lincoln county, and the trial of the cause on its merits was continued until the following November, 1922, term of the court. At that term the contest on its merits was heard before a jury and under instructions given by the court it rendered a verdict sustaining the paper as the last will and testament of J. Y. Robinson, and from that judgment appellant prosecutes this appeal.

At the threshhold we are met with some preliminary questions of practice, one of which is raised by a motion of appellees to strike from the record the bill of evidence consisting of the stenographer's report of the testimony heard upon the trial of the jurisdictional fact, upon the ground (a), that appellant made no motion for a new trial of that issue in the circuit court, and upon the further ground (b), that the evidence heard thereon was not made a part of the record. It is also insisted by contestant that his motion to try the jurisdictional fact before a jury should have prevailed; but that insistence cannot be sustained, since a court and not a jury is the proper tribunal to determine the issue of fact affecting the jurisdiction of the court to hear and try the cause. 15 C. J. 850, paragraphs 169 and 851, paragraph 170. Neither is there any merit in contestees' contention (a)

above, since the provisions of the Code, and the practice, as announced in the cases relied on, apply solely to new trials upon the merits of the cause and not to a reconsideration of interlocutory orders or decisions, as was clearly the nature of the court's determination of the jurisdictional fact here presented. Evidently at any time before final judgment in the cause the trial court had authority to withdraw his determination of that issue and to reverse himself thereon, or even to hear additional testimony, all of which he could do upon his own motion and at any subsequent term of the court before a final termination of the proceedings. For the same reason it was not essential, as is contended in insistence (b), that the bill of evidence heard upon the jurisdictional issue should be made and filed as is prescribed in the Code provisions with reference to a final trial of the cause upon its merits. If such evidence is properly filed within the prescribed time and in the prescribed manner after the final trial, it is sufficient, and may be considered on appeal in determining the merits of the issue involved.

In this case the transcript of the evidence heard on the trial of the jurisdictional fact was tendered in the Lincoln circuit court at its May, 1922, term, but there was no order of court filing it. After the verdict and judgment upon the merits at the November, 1922, term of the court, contestant obtained leave to prepare and file his bill of exceptions until a day in the following February, 1923, term of the court, and within that time he filed his bill of exceptions, in which the court certified to the correctness of the stenographer's transcript of the testimony heard upon the trial of the jurisdictional fact at the term of court one year previous, and identified it as being true and correct, and made it a part of the bill of exceptions; all of which, we are thoroughly convinced, fully complied with the practice as to the trial of such interlocutory issues, and had the effect to make the questioned evidence a part of the record for the purposes of appeal, and being so convinced it results that the motion to strike the evidence heard at the trial of the jurisdictional issue must be, and it is overruled.

The next question for consideration is whether the court properly adjudged the jurisdictional fact as to testator's residence, since under our statute a will must be probated in the county of testator's residence which has been held time after time by us to mean ''legal domicile'' of the testator, and not the place

where he was temporarily abiding. The law with reference to what constitutes, and with reference to what facts are necessary to create, a legal domicile, as well as the requirements necessary to the changing of a legal domicile after once established, is well settled; but the difficulty arises when it comes to apply the testimony as found in each particular case. Indeed, that difficulty has drawn from this and other courts the pronouncement that no fixed and unalterable rule can be applied in every case, but that each one wherein the question is presented must be determined by its own peculiar facts, circumstances and conditions. It is neither our purpose, nor is it incumbent on us as a part of our duties, to discuss all the law pertaining to the questions of one's legal domicile and the collateral matters as to the relevancy of the testimony upon such issue, the legal presumptions arising from certain facts, and various others related thereto, since that task is more appropriate to the author of a treatise on the subject and the writer of articles for encyclopedias of the law. It is sufficient for the purposes of this opinion for us to state that everyone has a legal domicile, and that its acquisition arises either from facts over which the possessor has no control (such as that of an infant whose legal residence is the same as his parents) or it arises voluntarily from the fact of an actual residence coupled with the intention of making it permanent, or presently fixed with only a floating intention of changing it. It is furthermore the rule that one's legal residence when once acquired remains so until he changes it in the legal manner, and the burden is upon the one asserting such change. In other words, both fact and intention are necessary elements in the acquisition or change of a legal domicile, i. e., the fact of actual domicile plus the intention to make it permanent for an indefinite time; but such indefinite intention will be sufficient, notwithstanding there may be the further entertained purpose to change the domicile at some unfixed time in the future, dependent upon a change in conditions which may or may not ever happen. Cases from this court announcing the above principles (but all of which may not be found in each of them) are: Tipton v. Tipton, 87 Ky. 243; Fidelity Trust, &c., Co. v. Preston, 96 Ky. 277; Helm's Trustee v. Commonwealth, 135 Ky. 392; Baker v. Baker, 162 Ky. 683; Saunders v. City of Flemingsburg, 163 Ky. 680; Semple v. Commonwealth, 181 Ky. 675; Ashland v. Catlettsburg,

172 Ky. 364; Martin v. Martin, 192 Ky. 418; Pettit's Executor v. City of Lexington, 193 Ky. 679, and numerous other domestic cases cited in those opinions. With those principles of the law in mind it remains to apply them to the facts of this case, as developed by the testimony, in order to determine our right to interfere with the judgment of the circuit court on this issue.

The testator was reared upon the farm of his parents in Lincoln county, and made their home his home until the death of his mother in March, 1917, his father having died in 1912. About 1907 or 1908 the farm in Lincoln county was sold, and the parents with the testator moved to a residence previously acquired in Lancaster, the county seat of Garrard county. For a number of years before the death of the mother, and perhaps before that of the father, the testator's principal business was that of a mule trader, with headquarters at Columbus, Georgia, where he spent the larger part of his time, but he would return to Kentucky in the latter part of the spring season of the year and remain until the following fall, spending a part of his time each year at Crab Orchard Springs. The last time he voted was in 1913 in a primary election in Lancaster, and he listed his property and paid his taxes in Garrard county; the last list that he made was in 1918 a short time before he went to live with his sister, Mrs. Paxton, in Lincoln county. Before the death of his mother he told her, according to the testimony, that after her death he expected to move or change his residence from Kentucky to Georgia at the place of his business in that state. About that time he became afflicted with high blood pressure, which resulted in a more or less hardening of the arteries and a final development of Bright's disease. He gradually grew weaker physically, but that condition fluctuated. Sometimes he would be a great deal better, apparently, than at others, but his general tendency physically was downward. In 1917 he went to a hospital in Atlanta, Ga., but came from thence to his mother's funeral. After her death he, having been the executor of his father's will, also qualified as administrator of his mother's estate and wound it up by dividing all of her personalty and by selling the home in Lancaster and dividing its proceeds among the surviving children, and which left him as the owner of no real estate in Kentucky nor any interests in any such property, his only corporeal belongings after that time being his wardrobe. In the spring of 1918 he took up

lodging at a hotel in Lancaster, where he had his personal belongings, a trunk and a movable wardrobe, the latter of which was in the hall of the hotel and not in his room.  None of his family were continuously with him at the hotel and it was finally concluded that he should be removed to the home of some of his brothers or his sister, and that of the latter was selected and he moved to her home on September 2, 1918.  Within a few days thereafter he went alone from thence to Lancaster and obtained his trunk, followed by his also removing his wardrobe within a short time thereafter.  He then had all of his corporeal personal belongings in the home of Mrs. Paxton in Lincoln county.  In the spring of 1919 he again went back to Lancaster at the solicitation of his sister, and as well as to carry out his personal desires, with the hope that his associations with friends at that place would improve his despondency, but before making the trip he procured the Hon. W. H. Shanks, who is now Auditor of Public Accounts for the Commonwealth, and who was then the president of a bank in Stanford, to write his will.  He went from that hotel to Crab Orchard Springs, which had been his custom for a long number of years, and stayed there until about November 8, 1919, and then returned to the home of Mrs. Paxton, where he remained until his death in September, 1920.  His brother, the appellee, George D. Robinson, listed his property in 1919 in Garrard county, but after his death the appellant listed the same property as of July 1, 1920, in Lincoln county, and he also made a federal income tax report for the decedent showing the situs of the estate as in Lincoln county.  He also procured Mr. Paxton, the husband of his sister, to fill in a death certificate in which the residence of the testator was reported as being in Lincoln county.  While decedent was living in Mrs. Paxton's home some sort of tax due to some municipality of Garrard county was demanded of him and he objected to paying it on the ground that he did not reside in Lancaster or Garrard county, but to save him annoyance he was persuaded by Mr. Paxton to pay it, since the amount was small.  Before he moved to the residence of his sister she had informed him that if the time ever came when he was without a home hers was open to him.

On the other hand, it is proven beyond question and admitted in this record, that up to the time when decedent took up his abode with his sister in Stanford his legal domicile was Lancaster, in Garrard county, and it was

during that time that he was registered in Johns Hopkins Hospital in the city of Baltimore as being from Lancaster, for he was in that institution before he went to the home of his sister. The listing of his property for taxes in the year 1919 by his brother, the appellant, George D. Robinson, was explained by him to have been done without giving the question of domicile any consideration and following the place where his property had theretofore been listed, but the explanation by appellant of his reasons for listing the property in Lincoln county for the year 1920 is not so plausible. They were: That he had heard of some possible proceeding in Garrard county by a revenue agent to require the estate to list omitted property for former years, and that he thought to list it in Lincoln county for the year 1920 would have a tendency to suppress any such move; and, further, that to so list it would be a courtesy to Lincoln county. One of these reasons was mercenary and the other one fanciful, but by no means plausible. However, those acts on the part of appellant are at most evidence of his opinion as to the true location of testator's legal domicile at the time of his death and can not have the effect to estop him in our opinion as is contended by contestees.

When we weigh the evidence as above briefly outlined, viewed in the light of the fact that decedent had no home in Kentucky to which he could go at his pleasure, and that the only abode he could possibly inhabit would be one for which he had paid rent or hire, and then only in the capacity of boarder, we are not prepared to say that the court incorrectly found that he had the intention of changing his legal domicile from Garrard to Lincoln county when he moved both his person and his belongings to the residence of his sister. There was the fact of an actual change, and under the law as found in the cases, *supra,* if that fact was coupled with the requisite intention on his part, a legal change of domicile was thereby effected. In arriving at that conclusion we have not lost sight of the contention by learned counsel for appellant that the decedent did not have sufficient mind at the time of his move to his sister's residence to entertain an intention, but that contention assumes the very fact in issue upon the merits of the cause, and which the jury found against him. There is no testimony in the record showing any intention on the part of the testator to only temporarily remain at the home of his sister; but if he did entertain a floating intention to eventually make the

state of Georgia his permanent domicile or to make any
other place his final abode after his permanent recovery,
it would not be material to the issue here, since it was
held in the Baker case, *supra,* that the requirements of
the law as to the establishment of a legal domicile would
be met whensoever there was a removal to another place,
"with an intention of remaining there for an indefinite
time, and as a presently fixed domicile, . . . notwith-
standing he may entertain a floating intention to return
(to his former or a newly acquired domicile) at some fu-
ture period." In the Saunders case the true rule for the
determination of such issues is thus stated: "Whether or
not a new residence has been acquired can not be made to
depend upon one fact or combination of circumstances,
but from all the facts and circumstances," citing the
Helm case, *supra.* Viewed in the light of such judicial
utterances and giving due weight to the finding of the
learned circuit judge, we are not prepared to disturb
his judgment upon the jurisdictional fact of the legal
domicile of the testator.

Upon the merits of the case we do not find the condi-
tion of the proof to require an extended discussion by us.
It is contended by learned counsel for appellant that the
contents of the will are very inequitable and which fact,
it is argued, supports the further contention that the tes-
tator was mentally incapacitated to make it, and that he
was unduly influenced to do so. The will, after devising
three pieces of jewelry to testator's sister and two nieces,
gave all the rest of his property equally to his brothers
and sister, but provided that "if any of them should die
without leaving issue living at the time of his or her
death, the amount received by him or her from my estate
is to go to and be divided among my kindred in accord-
ance with the law of descent and distribution." Since
appellant had no children it is his contention that the will
discriminated against him and in favor of his brother and
sister (the contestees) because of his having no children.
But we do not grasp the alleged persuasive force and
effect of that argument. All of the children of appel-
lant's brother and sister may die before they do, and ap-
pellant himself may yet have children born to him either
by his present wife or some future possible one, and thus
the conditions of the final resting place of the title to all
of the property may become so altered and changed that
he or his children, if any should be born, may eventually
become absolute owners of all of it. It is true that such

a culmination is improbable, yet it is possible. The testator evidently had in mind the vesting of title to his property in those of his own blood and kindred, and his will was perfectly phrased so as to carry out that purpose and intention. The only fact that made it seem unequal was the one that the appellant at the time of the testator's death had no children, but, as we have said, that condition may hereafter change and if so the will is absolutely equal.

On the issue as to mental capacity, there was a great contrariety of testimony. Witnesses who saw testator in his more depressed moments gave it as their opinion that he did not possess the legal standard of mental capacity to make a will, while an equal number testified to the contrary, including those who were with him more constantly and some of whom had known him all his life and had been associated with him in business. As is usual in such trials isolated instances are narrated by witnesses for contestant which would tend to substantiate their testimony, and perhaps at the very moments to which they testified there may have been a more or less dethronement of legal mental capacity. But even in those instances the acts and conduct of testator as testified to by the witnesses could be construed as emanating from his physical weakness at the moment and his depressed condition arising from the convincing fact that he was approaching dissolution, although he might have possessed capacity sufficient to make a will according to the measuring standards of the law.

Mr. Shanks, who prepared the will, stated, in substance, that the testator came to his bank and told exactly and intelligently how he wanted it written. It was prepared by the witness, and pursuant to an understanding he returned not later than the second day thereafter, when he read it, and it was subscribed by testator and witnessed by Shanks and a Mr. Bright, the cashier of the bank, who has since died. Shanks had been in the mule business with the testator in Georgia for a long time, and stated that his mind was as clear as he ever saw it. Other witnesses who saw him after he took up his residence in the home of his sister, in, around and about Stanford as well as at Crab Orchard, where he visited after that time, stated, in substance, that while he was afflicted physically and was depressed by reason thereof, yet his mind was clear and he would talk intelligently about business propositions and other subjects under discussion. The fact

that one is sick bodily or somewhat subnormal mentally does not disqualify him from devising his estate under our rule measuring mental capacity. It is a well recognized fact that most ailments of the body to some extent affect the mind; but there is a vast difference between a mind distressed by physical pain, and a mind where reason is dethroned or blindfolded or diseased of itself. This court has held on occasions too numerous to mention that the mere lowering of mental vitality by physical suffering does not disqualify one so afflicted from disposing of his property. Even if there was room for the contention that the verdict was contrary to what contestant contends was the preponderance of the evidence, we would not be authorized to sustain the argument that it was flagrantly so, much less could we hold that the motion for a peremptory instruction to reject the will should have prevailed.

The paper that was actually offered and probated was not the one that the testator executed. Some ten days or two weeks after the death of Robinson there was a family meeting at the home of Mrs. Paxton and which was held at the request of appellant. At that meeting it was announced by him that the will was lost and he contended that it was unjust as well as invalid because his brother was incapable of making it. A rather heated discussion was engaged in, and finally Mr. Paxton, in order, as he says, to relieve his wife from the effects of great nervousness with which she was then afflicted, suggested that "if it was lost let it stay lost." Mr. Paxton, his wife and George D. Robinson testified in substance to those facts, but appellant says that Mr. Paxton told him to destroy the will, which statement is denied by the former. At any rate, the next day appellant tore up the will, he being cashier of the bank in which it was deposited, and threw the pieces in the waste basket, notwithstanding the fact that there were infant devisees who could not legally consent to its destruction and who did not even attempt to give their actual consent. After the fact of destruction was learned, Shanks produced a copy of the will, which he stated was a copy of the original one, or at least a substantial copy, and it was that copy that was probated. The argument is now made that appellees not only consented to the destruction of the will but also that their motive for so doing was that the testator was mentally incapacitated to execute it. However, it should be observed that the evidence on that issue preponderates to the effect that neither of the appellees, nor Mr. Paxton,

ever consented to its destruction, and that all that was said on that occasion was by Mr. Paxton, and that he said that much only for the purpose of quelling the angry discussion by appellant, and to restore temporary peace among the members of the family, who had always theretofore lived upon affectionate terms. Under such circumstances we do not attribute the weight to that circumstance that is sought to be put upon it by the learned counsel for appellant. After a thorough review of all the testimony, which we have carefully read, we can find no ground authorizing our disturbing the verdict of the jury on the issue of mental capacity.

But it is strenuously argued that the court erred in declining to submit to the jury the issue of undue influence. Time after time we have repeatedly stated the universal rule to the effect, that in order to show undue influence upon a testator in the execution of his will, something more must appear in the proof than "an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but some evidence must be adduced showing that such influence was actually exercised. Brent v. Fleming, 165 Ky. 365, and by evidence is meant something of substance and relevant consequence, and not vague, uncertain or irrelevant matter not carrying the quality of proof or having fitness to induce conviction." Cecil's Executor v. Anhier, 176 Ky. 198. Numerous other cases preceding and following that one announce the same rule and it is now a fixed and permanently established one in this jurisdiction. There is no evidence in this case of the exercise of undue influence on the testator by Mrs. Paxton, her husband or other person more than a possibility that it was exercised by them and an opportunity to exercise such influence existed from the fact that he was living in the Paxton home. On the contrary, it is indisputably shown that on a prior occasion the testator expressed a desire to execute a will giving preference in the amount of his devises to his sister and his brother, George D. Robinson, because they each had children to educate; but Mrs. Paxton discouraged any such purpose. If she had desired to exercise such influence over her brother, to whom she showed such devoted attentions, it would have been an easy matter for her, if she had the power and was so inclined, to have procured him in his will to give her a greatly disporportionate part of his property and thereby enriched herself

at the expense of the other devisees. Instead, however, we find the will to be exactly equal, provided each of them occupy the same status of parents to living children at the time of the final distribution. In that state of the record we find no room, as we have often held in prior cases where the proof was similar, to sustain appellant's contention that the issue of undue influence should have been submitted to the jury.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.