## Kidd et al. v. Rodfus et al.

(Decided November 17, 1931.)

134

C. H. WILSON, J. R. WELLS and H. PATE WELLS for appellants.

CHARLES FERGUSON and D. H. POSTLEWAITE for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

This is a contest of a codicil to the will of P. M. McGrew. The testator was a substantial farmer, and for twenty years had been a director in the bank of Carrsville, a near by village. At the time of his death he was in his eighty-first year. He had outlived his family. His wife died in 1910. Both his son, who never married, and his daughter, who had married but was childless, died in 1900. His heirs were the children of his two brothers and sister. A niece of his wife, Mrs. Addie Rodfus, before her marriage, had lived in his home, and, after she became a widow, returned there and kept house for the testator for twenty years before his death. Her brother, Henry Hardin, had been working and living there for some twelve years, and Herbert Trail, another relative of his wife, had lived there from the time he was five years old until grown.

On September 30, 1924, Mr. McGrew made a will in which he devised one-sixth of his estate to the heirs of his two brothers, G. N. McGrew, and Felix B. McGrew, respectively; one-sixth to the heirs of a deceased sister, Mrs. A. E. Tyler; and one-sixth each to Mrs. Rodfus, Herbert Trail, and his son-in-law, Dr. C. E. Kidd. On March 5, 1929, he executed a codicil to that will, which alone is contested by the devisees of the original will, excepting the two mentioned in the codicil.

In the codicil there was devised to Mrs. Rodfus $2,-850 (directed to be paid before any item in the original will except his debts and funeral expenses), and to his

nephew, Milton McGrew, his home farm consisting of 360 acres, "provided said Milton McGrew moves upon said farm and cares for me (P. M. McGrew) during the remaining part of my natural life." He further directed that Milton McGrew should not share in the one-sixth of the estate devised to the heirs of Felix B. McGrew, and that that one-sixth should be equally divided among the remaining heirs of that brother.

The attack upon the codicil is upon the usual grounds of mental incapacity and undue influence exerted upon the testator. A reversal of the judgment sustaining that instrument is sought principally upon the ground that the verdict is contrary to the evidence in the degree commonly described as being palpable.

We shall undertake to state only the more prominent conditions disclosed by the evidence. In 1927, the testator suffered a slight attack known as progressive bulbar paralysis or glossolabiolaryngeal paralysis (freely translated as paralysis pertaining to the tongue, lips, and throat). It is stated that in 1928 he suffered another stroke, but the medical evidence is that there is no subsequent well-defined attack, but a progression of the disease, with now and then a more acute appearance for a brief period. After the paralytic stroke, according to the evidence, the testator had great difficulty in talking. As he expressed it, he knew what he wanted to say, but could not say it. His right leg and arm were partially paralyzed and their use impaired progressively. He was therefore impeded in getting about and in feeding himself. A few lay witnesses, principally the contestants or their near relatives, expressed the opinion that he was of unsound mind, the basis of which was mainly his inability to articulate, changing the subject of conversation in the midst of it, and a lapse of memory.

Dr. Kidd, testator's son-in-law, whose one-sixth interest in the estate devised to him by the original will was diminished by the codicil, expressed the professional opinion that he was of unsound mind. This was based upon several incidents of the character above stated coming within his knowledge and observation. He testified that progressive bulbar paralysis has its origin in the medulla oblongata (which is an organ or nervous substance of the brain connecting the spinal cord at the base of the skull—the nervous center), and that there are two or three different kinds of bulbar paralysis, all of which affect the mind. Only to Dr. Kidd and one of

the lay witnesses were propounded the usual question asking for an opinion as to whether the testator possessed the mental capacity to know the nature and extent of his estate, the natural objects of his bounty, and his duty to them and to dispose of his estate according to a fixed purpose of his own. Both answered that he did not. Dr. J. T. Reddick, who had never known the testator, defined the disease of which he had died as one of the nervous system of the brain, and stated that not all but most cases of bulbar paralysis affected the mental faculties, especially in an older person like the testator. Dr. O. R. Kidd, brother of contestant, had made an examination of Mr. McGrew in September, 1927, and found his mental and physical capacity impaired. To neither of these physicians was the usual question as to the standard capacity submitted.

Over against this evidence as to mental capacity, a number of neighbors and men of affairs having business contacts with the old gentleman testified to his mental vigor and complete capacity, and stated that his condition interfered with his physical activities only. Several local physicians substantiated the contestee's claim that the disease with which the testator suffered does not impair a patient's mind at all. Excerpts from a number of standard medical authorities were read to the same effect, that the disease does not impair the mental faculties. Under the usual form of questioning, all of these medical witnesses expressed their opinion that the testator possessed testamentary capacity.

The claim of the exercise of undue influence was in the main rested upon his situation, and the relation of the beneficiaries of the codicil to the old gentleman, accentuated by the immediate circumstances surrounding its execution. There were a few trivial incidents related from which it is argued by the contestants that Mrs. Rodfus had at all times exercised an undue influence over testator. But we cannot so regard them.

Some months before the codicil was executed, Henry Hardin, who had been doing the work about the farm, left there, and the young man, Herbert Trail, had also gone away because of a disagreement with Mrs. Rodfus. Since the previous June a nephew, Milton McGrew, who lived on rented property near by, had regularly attended to the farm of his uncle and waited upon him. It appears that he stayed with him in the night to answer his calls, and that he rendered such services as the old gentleman

needed. During the week preceding the making of the codicil, on his own initiative he approached his uncle upon the subject of paying Mrs. Rodfus for the services she had rendered him. Mr. McGrew stated that he had been thinking about that matter himself. Mrs. Rodfus came in an hour or so later, and the subject was discussed with her. She asked Mr. McGrew whether he thought $150 a year was too much, and he responded he thought it was reasonable, and they calculated the amount due, which for nineteen years was $2,850. He then asked his nephew what he wanted, and he told him that he felt he could no longer neglect his family and his affairs without some arrangements being made, and that he would make a proposition. He did propose that he would take care of the old gentleman for his two farms. Mr. McGrew stated that one of them was enough, and that he would let him have the home farm, which was acceptable.

At his request, the nephew advised Albert Likens and Frank Padon, old friends who were associated in the banking business with him, that Mr. McGrew wanted them to come over and fix up some business for him. He also told D. H. Postlewaite, a young lawyer who was then principal of the Carrsville High School, that his uncle wanted to see him. On Sunday the nephew met up with his cousin, Miller McGrew, one of the contestants, and talked over the situation with him, and Miller McGrew stated that he thought the arrangement was fair. Their uncle's capacity to make a contract was then discussed.

On the following Tuesday, Dr. Casper, the testator's physician, called, on information from Milton McGrew that he was wanted, and he says the old gentleman asked him to make an examination to determine whether he was mentally capable of transacting business. The doctor made an examination, which, together with his long acquaintance and professional knowledge of the patient, convinced him that the old gentleman was mentally qualified. On that morning also the attorney and two friends came, and the codicil was drawn by the attorney according to instructions and the sole dictation of the testator. These men testified positively and convincingly as to his acts and statements at the time which sustain their expressed opinion that he possessed capacity to make the will. Miller McGrew, nephew, and Her-

bert Trail, contestants, were there also, though they, like Mrs. Rodfus and Milton McGrew, had no part in the drafting or execution of this instrument, and were not in the room when it was done. Miller McGrew admits that the old gentleman's mind appeared to be exceptionally clear that day.

The men all remained for dinner, and in the afternoon Mr. McGrew had Postlewaite to draft a contract with Milton McGrew covering the operation of the farm during his lifetime. He first had it drawn so as to give Milton what he could make out of it for his care, but it then occurred to him that he ought to have something from it himself. He then had the contract rewritten so that it provided in substance that Milton should operate the farm and share the proceeds equally with him. It also provided that the tenant house should be repaired at an expense not exceeding $100 for occupancy by Milton. This contract was rewritten twice in order to meet the exact wishes of the old gentleman as to certain details. As in the execution of the codicil, he displayed wisdom and mental acumen and an ability to take care of himself in the trade.

There also appears evidence to the effect that Mr. McGrew a little later assigned to Mrs. Rodfus a note for $1,000, which he held against one of his nephews. This, it appears, was for the purpose of compensating her for keeping house and waiting upon the old gentleman in the future, since the promise to pay her $2,850 covered the preceding nineteen years. While it develops that this $1,000 proved to be very liberal compensation, for he lived only about a year, yet the length of life and the extent of the old gentlemen's disability was speculative, and it might have developed to be disproportionate the other way. It appears the assignment of this note is the subject of litigation, and we do not mean to imply a conclusion respecting it except as an item of evidence bearing on the issues in this case. There is some evidence to the effect that Mrs. Rodfus had stated several times that she had been compensated for her services. This was in contradiction of testimony that she had not been paid. Statements attributed to some of the contestees tending to contradict their evidence as to mental capacity were also introduced, but they, of course, only went to their credibility as witnesses.

The opinions of this court are replete with will contests, and the repetition of the standards by which the

cases are tried and the weight to be given evidence would be superfluous. Every case of this character has its peculiarities. Precedents are to be considered as guides towards a correct decision upon the questions raised rather than as inflexible rules. It is sufficient to say that this court has never held that old age or physical disability deprives one of the right to dispose of his property as he wills; nor that merely opportunities to exert influence over the testator are proof of improper or undue influence. Robinson v. Paxton, 210 Ky. 575, 276 S. W. 500; Thomas v. Thomas, 2 Ky. Op. 338; Robinson v. Davenport, 179 Ky. 598, 201 S. W. 28; Schrodt's Ex'r v. Schrodt, 181 Ky. 174, 203 S. W. 1051; Frazie's Ex'r v. Frazie, 186 Ky. 613, 217 S. W. 668; Bailey's Adm'r v. Bailey, 184 Ky. 455, 212 S. W. 595; Cecil's Ex'rs v. Anhier, 176 Ky. 225, 195 S. W. 837; Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S. W. 455.

In Lee v. Kirby, 186 Ky. 603, 217 S. W. 895, the testator had devised his home place to a nephew, provided that he should care for him as long as he should live. The evidence to the effect that the testator was not mentally capable to make the will was stronger than that submitted by the contestants in this case, and it does not appear that evidence sustaining the will was as strong as that produced here. The case was submitted to the jury, and the court held properly so. Under this analogous condition, we have no difficulty in determining that the evidence is sufficient to support the verdict of the jury.

The appellants submit as misconduct warranting a reversal of the judgment a statement made in argument by one of the appellee's counsel in substance that Dr. Kidd, one of the contestants, would not dare to say that any improper relations had existed between the testator and Mrs. Rodfus. It is contended that the statement was injected into the argument as an insinuation of a belief on Dr. Kidd's part, which was wholly without basis, and uttered only for the purpose of prejudicing the jury. The statement was uncalled for, but we cannot conceive that it had any effect upon the jury in reaching its verdict.

No objection is made as to the instructions or the rulings of the court on the admission of evidence.

The judgment is affirmed.