## McFarland, et al. v. Ewing, et al.

(Decided February 10, 1920.)

Appeal from Daviess Circuit Court.

1. **Wills—Mental Capacity—Competency of Letter.**—In a contested will case where the question is mental incapacity the evidence may be allowed to take a wide range, and every fact and circumstance in the life of the testatrix which tends to show her mental condition at the time of the making of the will may be presented to the jury under the rules of evidence; and where the testatrix has indicated at different times in previous years when her mind was acknowledged to be sound, her desire to give her property to certain of her kindred and to exclude certain others and has stated the reason therefor, all these facts may be presented to the jury; and a letter written by one of her relatives showing his ill will towards the testatrix is relevant and competent to

prove that the disposition of the property made by the testatrix was according to a long fixed purpose of her own determined upon when she was in a sound mental condition.

2.   Wills—Undue Influence—Question for Jury.—Where there is no evidence tending to show the exercise of undue influence over the testatrix at the time or before the making of a will, the trial court should not submit the question of undue influence to the jury.

E. B. ANDERSON and W. P. SANDIDGE for appellants.

LOUIS I. IGLEHEART, GEORGE S. WILSON and HERMAN A. BIRKHEARD for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

The last will of Vitula McFarland, who died July 10, 1917, at Owensboro, Kentucky, at the age of eighty years, was probated in the county court, from which order an appeal was prosecuted to the circuit court, where a trial was had before a jury and the paper in question found not to be the will of Miss McFarland on the ground that the testatrix did not possess mental capacity sufficient to dispose of her property by will. From the judgment entered in the circuit court rejecting the will, the propounders have appealed to this court. The will is very brief and simple, and while executed according to the forms required by the statutes, is assailed on two grounds:

(1)   Mental incapacity of the testatrix.

(2)   Undue influence exerted over her by the beneficiaries named in the will, and their friends.

As the beneficiaries were not present at the time of the making of the will, and there was no evidence tending to establish undue influence, this question was not submitted to the jury. On the question of mental capacity of the testatrix the evidence takes a wide range and covers more than two hundred typewritten pages. For the propounders sixteen witnesses were called who testified concerning the mental condition of Miss McFarland at the time and for some years before the making of the will in question. Among these sixteen witnesses were the three who witnessed the will. The only physician testifying in the case was Dr. J. B. Lacer. He had been the family physician of Miss McFarland for a number of years. In November before her death in July,

Miss McFarland fell upon the pavement, sustaining a fracture of the hip bone, from which she never fully recovered and which confined her to her bed continuously until her death. Before that time she had been going about attending to her business and was regarded by all her acquaintances as a person of strong mental attributes. After her injury she failed greatly in physical strength and if we may rely upon the witnesses for the contestants equally so in mental grasp. For many years before her death she and a sister of about the same age lived together and held their property in common. As far back as 1887 they each made a will giving to the other all their property both real and personal. This was done in conformity to an agreement between them that the survivor should have all of the property. The sister died March 7, 1907, while Miss Vitula was lying helpless in bed in another room as the result of her injury. The death of the sister was kept secret from Miss Vitula for about ten days when it occurred to some of the friends of the family that she should be made aware of the decease of her sister and also have her attention called to the fact that she had given to her deceased sister by will all of her property and had made no provision in the will for the disposition of the property in case of the death of the devisee before her death. Following this plan on March 17th, 1917, Dr. Lacer, her family physician, and her attorney and adviser, Judge L. P. Little, and his son, L. Freeman Little, called on Miss Vitula at her sick room and told her of the death of her departed sister; and after the lapse of a few minutes in which Miss Vitula was given time to compose herself they reminded her of the fact that she had willed all of her property to the sister who had passed away, and inquired of her whether she would like to make a further disposition of her property and she having indicated that she would like to do so, inquiry was made as to whom she would give the property, to which she answered that she wanted her niece, Vitula McFarland, and her nephew, Watkins McFarland, to have all of her property and did not want any of the other nieces and nephews to have any interest in her estate. Thereupon the will in question was prepared, signed and witnessed in her presence. She died July 12th. The will in contest reads as follows:

"I, Vitula McFarland of Owensboro, Daviess county, Ky., hereby make this my last will and testament revoking all former wills. ·

"I hereby give, devise and bequeath all the property, personal and real, of which I may die possessed, unto my nephew, Watkins S. McFarland, and my niece, Vitula McFarland, children of my brother, Walter McFarland, share and share alike. ·

her

"VITULA McFARLAND.

x

mark."

All three of the witnesses who were present · at the· time the will was made testified that they had known Miss Vitula for a number of years and that they talked with her frequently and that on the day the will was made they conversed with her for some time before the instrument was prepared and that she was in the full possession of her mental powers and capable of making a survey of her property, knowing the objects of her· bounty, and her duty to them, and had mental capacity to dispose of her property according to a fixed purpose· of her own. No one of them doubted her ability to do· each of these things. In addition to these three men the· propounders called two bankers who had transacted. business with her who thought that Miss Vitula's mental grasp was sufficient to enable her to make a will. A number of her neighbors, including some ladies, were· called and allowed to detail many of the everyday occur-- rences about her home which were strong circumstances. to prove her mental capacity to make a will. In fact all of the sixteen witnesses called by the propounders were entirely satisfied that the testatrix disposed of her property in a rational way according to a fixed purpose of her own. ·

For the contestants, sixteen witnesses testified,. among them, Mrs. Emma Poindexter, Mrs. Mary Lou Owens, Mrs. Bettie Alexander, Mrs. Elmira Davis, Mrs. Lee Anna Harsh, Mrs. Lutitia Lewis, Mrs. W. W. Lewis, Bunk Miller, and Mercer Talbot, each of whom was related to the testatrix, and therefore more or less interested in the result. These witnesses were the only ones for contestants who gave relative evidence of a decidedly probative nature; the balance was rather indistinct and

more or less scattered and irrelevant. While we are not prepared to say there was not sufficient evidence to support the verdict, we are convinced that the great weight of the evidence given by those not directly interested in the result of the trial is for the propounders of the will. Though we regard the verdict and judgment as against the preponderance of the evidence, it would not be disturbed on this ground alone.

Appellants insist that the trial court committed reversible error in excluding from the jury a letter from Stanford McFarland, addressed to testatrix and her sister, bearing date August 17, 1901. It reads as follows:

"Owensboro, Ky., Aug. 17th, 1901.

"Dear Tula and Tira:

"There is one thing I wanted to speak to you about before I left but Sam Lancaster was there, this is the last favor I will ever ask. I want it granted. If you have told *any one here that I asked you to endorce* for me I want *you to* correct it immediately another party done the same thing for me no relation in the world they did it cherfully and willing, so I have the proof to uphold me if necessary, and will do it if I hear it. What you have done for me I appreciate it to the fullest extent. I have spoken of it time and time again. You intimated you had some awful things you could tell against me. I suppose all I have to say is *crack your whip* and see if I don't tell a heap of *things you never* dreamed that *I knew crack you whip.*

"Good bye Stanford."

The propounders of the will were attempting to prove not only that the testatrix was of sound mind and disposing memory, but that she gave her property to Vitula and Watkins McFarland because she had a grievance against her other nieces and nephews, children of her brother Stanford McFarland. In other words, that she was controlled in her devises in part by a very natural resentment against her brother and his family on account of ill-treatment. In will cases where the mental capacity of the testatrix is in question, the evidence is necessarily allowed to take wide range and every fact and circumstance that throws light upon the mental qualifications of the testatrix is admissible. This

evidence may cover a number of years if it will aid the jury in determining whether the testatrix had mental capacity to know the objects of her bounty, her duty to them, to make a rational survey of her estate and dispose of it according to a fixed purpose of her own. To this end evidence had been introduced showing that testatrix on different occasions back through the years expressed a fixed purpose to give her property to her nephew and niece just as expressed in her will, and had assigned as one of the reasons for so doing that her brother, Stanford McFarland, and his family, had been antagonistic to her in matters relating to some property which had descended to her and the other heirs of her parents. One of the propounders, Miss Vitula McFarland, testified concerning the finding of the wills of both Miss Vitula and Miss Statira McFarland with some notes and other valuable papers including a letter from Stanford McFarland in a tin box carefully hidden away in the house. From the evidence we learn that most of the precious documents of these two maiden ladies were preserved in this simple receptacle. That these were their dearest possessions is made clear by the fact that their last wills were both included in the box. Reasoning from this we conclude that these two old ladies attached great importance to this letter from their brother Stanford. No doubt the last sentence in the letter deeply grieved and hurt them, and no doubt aroused more or less resentment in their hearts toward their brother, and caused them to resolve not to allow him or his seed to have any part of their estate. This letter was sixteen years old at the time of the death of Miss Vitula, yet it had not been destroyed or misplaced. It had been preserved for some reason and no doubt for the very purpose which it now serves. It is not questioned that the propounders had a legal right to produce evidence tending to show that the will disposed of the property according to the oft expressed intention of the testatrix, and further that the testatrix had a fixed purpose not to bestow any of her worldly goods upon her brother, Stanford McFarland, or his family, who now seek to obtain a share in it. This evidence is important in this case, because it is admitted by the contestants that Miss Vitula in former years was a woman of strong mind and fixed purpose; and if the will in contest disposed of her

property according to her original intention and in a rational way, evidence tending to establish these facts is both relevant and material. 'Nothing could have been introduced as evidence on the trial that would have more clearly demonstrated the unfriendly feeling that existed between Stanford McFarland and the testatrix, at least the feeling which he held against his sister, than the letter in question. It asked, almost demanded a favor of her, and before concluding the letter breathed a threat against her in case she did not comply with his request. What could have been more cutting than this language of the letter: "You intimated you had some awful things you could tell against me. I suppose all I have to say is *crack your whip* and see if I don't tell a heap of *things you never dreamed that I knew—crack your whip*." A sister would hardly be expected to leave by will any part of her estate to a brother or to the children of a brother who had mistreated her, avoided her and then added insult to injury by writing such a wicked and malevolent letter as the one copied above. We think such a letter had it been made a part of the evidence would have been materially relevant and of controlling influence in the trial of this case, especially where the evidence as to the mental capacity of the testatrix is divided.

If the evidence for the contestants materially preponderated we would not attach so much importance to this letter, but in this case where we regard the great preponderance of the evidence as on the side of the propounders, we think this letter, if admitted as evidence before the jury, might have exerted a controlling influence.

Appellees not only insist that the letter was not competent in any event, but they especially insist that had the letter been otherwise competent no sufficient ground was laid for its introduction as it was not shown by any one acquainted with the handwriting of Stanford McFarland from having seen him write that the letter was his handwriting or that he wrote the letter which is signed by his first name only. We do not regard this as important, for whether he wrote the letter or not his sisters who received the letter with his name signed to it, threatening them if they did not keep secret a certain transaction which they had undergone with him, had the same effect upon their minds as if the letter had been

genuine, which we have no doubt it was. Whether the letter was genuine or not, it influenced the testatrix sixteen years before the making of her will to give her property to her niece and nephew and to exclude her brother Stanford and his children from participating therein. The fact that these old ladies treasured this letter and kept it in their safety box with their other valuables shows what a lasting impression it made upon their minds and that they believed beyond question that it was the letter of their brother for whom they had that day refused to indorse. Considered in this light, the letter was competent to prove the feeling that existed between Stanford McFarland and his sister, the testatrix, and to establish a reason for testatrix bestowing all of her property upon the beneficiaries named in the will instead of upon the children of Stanford McFarland.

The court in excluding the letter from the consideration of the jury, committed error for which the judgment must be reversed for a new trial.

Judgment reversed.