## Fitzgerald, et al. v. Fitzgerald, et al.

(Decided February 5, 1924.)

## Appeal from Bourbon Circuit Court.

1. Wills—Testamentary Capacity Held for Jury.—In contest of will, question of testamentary capacity held for the jury.
2. Wills—Finding of Testamentary Incompetency Sustained by Evidence.—In a will contest, a finding of testamentary incompetency held sustained by the evidence.
3. Wills—Whether Eccentricity Amounted to Testamentary Incapacity Jury Question, Notwithstanding Opinion Evidence.—Such acts· or conduct of testator as only show him to be eccentric or unusual in his disposition and conduct, or such habits or qualities as cause him to do things not consistent with the course usually pursued under like conditions by normal men, generally are insufficient to show mental incapacity, but where his conduct shows .such a departure from the usual course of conduct of normal men as to indicate mental impairment, the case should not be taken from the jury, though·the opinion witnesses are all non-experts, when their opinions are based upon the facts proven. .
4. Wills—Complaint as to Rebuttal Testimony Not Considered where Not Pointed out on Motion for New Trial.—A complaint that court erred in permitting a physician to testify in chief for contestants of will while on the stand in rebuttal is not presented for·review where appellants failed to point out and rely upon such error in their motion for a new trial, though they did in such mo-. tion complain of incompetent evidence admitted.

VIRGIL CHAPMAN, TALBOTT & WHITLEY, and T. E. KING for appellants.

DENIS DUNDON and W. A. BYRON for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Affirming. .

This is a will contest in which the jury found a verdict against the will on the ground of incompetency.

The chief ground for reversal is the refusal of the trial court to direct a verdict finding for the will, upon the ground there was not sufficient evidence of the testator's incompetency to authorize a submission of that question to the jury.

In the early or middle eighties William and Thomas Fitzgerald, brothers and both unmarried, removed from Bracken county in this state to the locality along the border line of Bourbon and Harrison counties. They were farmers and at the time had little or no property.

They were, however, industrious and frugal, and engaged in farming together, and for several years owned what they accumulated in partnership or in common. The relations between them were the very best during their entire lives, and they gradually accumulated by their joint efforts a few thousand dollars in property. They each remained single for several years after the removal, but finally Thomas, the younger, married, and it was thereafter deemed advisable by them to have a settlement and divide their common property, or settle their partnership. This was amicably done, and agreeing upon the value of their property a sale was made by William to Thomas of his interest therein. After the sale William, for a year or more, continued to live at the home of Thomas with him and his wife, and during all this period the relations between the brothers continued kindly and affectionate, and there is no evidence of any disagreement or difference between them whatever. Thomas early in his married life appears to have become the owner of a farm, and William, after living a year or so with Thomas, bought an adjoining farm, where he lived for the rest of his life. They continued to farm as such neighbors until 1911, when Thomas died, they having each been in the meantime prosperous. William remained single and died a bachelor in 1920, but Thomas when he died in 1911 left a widow and seven children living upon the farm adjoining that of his brother William, the houses on the farms being only a short distance apart.

The relations between the two brothers throughout their lives are shown to have been especially good, and when in 1911 Thomas died William took great interest in and manifested great concern as to the welfare of his deceased brother's children. The children, or some of them, visited him daily, and he often went to their home; they consulted him about all their business affairs and farming operations, and he cheerfully gave them the benefit of his advice and experience. He expressed and manifested great interest in and affection for them. After his brother's death he referred to them as "the Fitz chaps," and upon other occasions as "my children." Most, if not all, of Thomas' children were when he died in 1911 under age, and it appears to be conceded that thereafter their uncle William manifested the tenderest care and solicitude for their welfare, and gave to them every assistance in the management and operation of their farm short of financial aid. William was very frugal in his

habits, and the witnesses refer to him as being "very close," and it affirmatively appears that never at any time either during the life of or after the death of his brother had he given to any of these children anything whatever.

William was a strong, vigorous man, as well as self-reliant and had opinions of his own. He continued to be so after the death of his brother until February, 1920, when he was suddenly taken ill with a trouble or malady which for some time was not accurately diagnosed. Before his illness he weighed about 170 pounds, but thereafter began gradually to fall off and to be subject to violent pains. Finally, in the latter part of April, upon the advice of physicians, he went to Paris and had an X-ray picture taken in the hope of definitely determining the nature of his trouble. The doctors even before that had suspected cancer of the stomach, but had not so notified him. The first X-ray picture was inconclusive, and did not definitely fix the nature of his malady, and finally on the 26th of May another X-ray was taken, and then the doctor ascertained for the first time that what he had previously suspected was true, and the patient was suffering from cancer of the stomach. After consultation with some members of his family, the doctor on that day so notified William, and advised him to submit to an explorative operation with the hope of saving or prolonging his life, but at the same time told him without such operation he could probably live only from three to six months. William declined to submit to an operation, and apparently resigned himself to his fate, and expressed his belief that he could live only a short time.

On the day after, or the second day after, having been so notified by his physician, he sent for a lawyer and executed his will, wherein he gave to the children of his deceased brother Thomas and to a sister, Mrs. Sweeney, one thousand dollars each, over and above what he gave to each of his other brothers and sisters and their descendants.

It appears that some time before the doctor advised him of the nature of his malady, and told him he could only live a short time, he had become very much depressed, and had left his own home where he lived alone with two colored tenants, and gone to the nearby home of his brother's widow and said in substance that he expected to live with her and her children until he died.

William Fitzgerald had a brother, John, living not far away, and a sister, Mrs. Sweeney, at Paris, a few

miles distant.  John appears to have had, during William's illness, charge of his business and the management of his farm, while Mrs. Sweeney spent a good portion of her time with her brother William, in the capacity of nurse.  William remained at the home of his deceased brother from the 2nd of May, when he went there with the expressed determination of remaining with them until he died, until the 28th day of June.  John was frequently at the home, and it appears that during the latter part of William's stay there some considerable friction had developed between John and some of the members of his deceased brother's family, including the widow.  This situation developed into an open quarrel between John and the widow and some two or three of her children, and while William was the subject of this quarrel and controversy, he appears to have had no part in it, and not to have participated in it.  The quarrel was not creditable to either party, but it seems to have resulted in the accomplishment of John's purpose to remove his brother William back to his own home, for in the late afternoon of that day he was so removed by his sister-in-law and one of her daughters in their own machine.  Two days thereafter and on the 30th of June, John again sent or went for the same lawyer, and William made a new will, wherein he wholly disinherited the children of his deceased brother, Thomas, whom he had favored as devisees in his will made about thirty days prior thereto.

He died on the 15th of August thereafter, and the last named instrument was probated in the Bourbon county court.  An appeal from the order of probate was prosecuted by the children of his brother Thomas, and a trial in the circuit court resulted as stated.

The evidence for contestants on the trial showed that from the time he was stricken in February until the 26th of May when he was informed of his condition, he gradually lost weight and his physical condition gradually became worse, and that from the latter date until the 30th of June when the last will was written, he still declined in health even more rapidly.  It is shown that between the 26th of May and the 30th of June he was very much depressed, that a large part of the time he was in a stupor, that he talked very little and would only answer questions when aroused from his stupor, and then in a few words.  That he took very little interest in the things that went on around him, and although he had when in good health been a great talker and quite a conversationalist,

he during that period had practically nothing to say and only answered questions when aroused from his stupor; that he slept most of the time, and even when not asleep appeared to be drowsy.

This same character of evidence was given by several witnesses who were very familiar with him, and who saw him frequently during the month before the writing of the last will, and several who saw him oftenest and who were the most familiar with him and his then condition, expressed the opinion that he was not, the latter part of June, capable of knowing his estate, the natural objects of his bounty, and distributing the same in accordance with a fixed purpose of his own. This evidence by nonexperts is supplemented by that of a physician who attended him during part of the month before the writing of the last will. It is further supplemented by evidence to the effect that between the 26th day of May and the 30th of June there had been prescribed for him and administered to him, in an effort to relieve his excessive pain, more than thirty grains of morphine, or approximately a grain a day. In addition to that quantity of morphine taken internally, there had been during that period administered to him other doses of morphine by hypodermic injection and all of these things are supplemented by the expert testimony of another physician to the effect that such a quantity of morphine consumed by one in a weakened physical condition within that time would impair his mental condition. The evidence is that morphine was first prescribed for him on the 26th day of May, the day of the final diagnosis when he was informed of his condition, and the first will was written probably the day thereafter before the medicine had had any opportunity to impair his mental vigor. But from that time on until the 30th day of June, when he executed the last instrument, he not only continued to rapidly decline in weight and strength, but the doses of morphine were increased, and he appears to have taken it regularly, with a few exceptions, every four hours, or oftener when in extreme pain.

This evidence when considered in connection with the admitted fact that on the 27th of May the children of his deceased brother, who had been his partner in business and lifelong companion, were the favored objects of his bounty, while only a few weeks later they were the only ones of his kinsmen who were disinherited, would appear to authorize the submission to a jury of the question of testamentary capacity.

The fact that during the interim between the two wills an unfortunate family quarrel had occurred, in his presence, but in which he had no part, between a brother of his on the one side and a sister-in-law and one or two of his deceased brother's children on the other, furnishes no sufficient reason why he should have, in his normal mental condition, disinherited not only the children engaged in that quarrel, but the ones who were not present and had no part whatever in it.

Not only so, he recites in his last will that he has given no part of his estate to the seven children of his deceased brother Thomas

> "Because I have already given them all I wish them to have of my estate,"

when the evidence unmistakably shows that he had never at any time given to any one of them a cent.

While it may be said there is no specific fact testified to which in and of itself may be direct evidence of incompetency, yet when it is shown that he was in a stupor and drowsy and asleep most of the time during the month previous to the making of the last will; that his physical condition during that period had rapidly grown worse, and at the same time he had taken on an average a grain of morphine a day, and these things are weighed along with the expert evidence of their effect upon his mental vigor, and the apparently unexplained change of heart by him in that short time toward his favorite nieces and nephews, it must be said there was not only sufficient evidence to submit to the jury the question of mental capacity, but sufficient evidence to uphold the verdict of incompetency.

We have here not only the opinion of several non-experts as to decedent's incompetency, and the opinion of two physicians who had treated him, but we have the fact that during the greater part of the month before the execution of the last instrument he was in a stupor, paid little attention to what went on around him, and rarely spoke except when aroused from his stupor and asked a question, and we have the additional fact that throughout nearly that whole month he had been given large quantities of morphine, in an effort to relieve his excessive pain, and that that impaired his mental vigor.

It is true such acts or conduct of one as only show him to be eccentric or unusual in his disposition, and

conduct, or such habits or qualities as cause him to do things not consistent with the course usually pursued under like conditions by normal men generally, are insufficient to show mental incapacity; yet, where his conduct shows such a departure from the usual course of conduct of normal men as to indicate mental impairment, the case should not be taken from the jury, although the opinion witnesses are all nonexperts, when their opinions are based upon the facts proven. The proven condition of decedent for the last month before the last will, the fact that during that month he took considerable quantities of morphine, supplemented by the evidence of his weakened and emaciated condition, furnished the basis for the expression of opinion not only for the nonexpert, but for the expert witnesses. Wood v. Corcoran, 190 Ky. 621.

It is said the court erred to the prejudice of appellants in permitting one of the doctors to testify in chief for contestants while on the stand in rebuttal. But that question is not presented because of the failure of appellants to point out and rely upon such an error in their motion for a new trial.

It is true they did in such motion complain of incompetent evidence admitted for contestants, to which they excepted; but nowhere did they point out as a ground for new trial that the trial court had permitted the physician, while on the stand in rebuttal, to give evidence in chief.

The complaint in the motion for a new trial of the alleged incompetent evidence admitted for contestants clearly has reference only to such evidence as was wholly incompetent, and not to the fact that a witness in rebuttal had been permitted to give evidence which would have been competent if given in chief.

Judgment affirmed.