### Petty, et al. v. Pace.

(Decided January 27, 1925.)

#### Appeal from Allen Circuit Court.

Deeds—When Grantor of Sound Mind, Deed to One Occupying Confidential Relationship Not Set Aside.—Deed made by 74 year old woman to her physician and intimate friend, who had promised her husband to take care of her and performed his promise, will not be set aside, despite the confidential relationship, where grantor, though not mentally strong, was of sound mind at time of execution.

GARDNER, OLIVER & DIXON for appellants.

HARPER & DENTON, F. R. GOAD and W. D. GILLIAM for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

The appellants are here because the trial court dismissed their petition whereby they were seeking to set aside a deed made by their aunt, Mary F. Rickman, to Dr. J. E. Pace, by which she conveyed him her property. Mrs. Rickman died in Allen county, Kentucky, on March 30, 1921, at the age of 77. She was the widow of Major Rickman, who died twelve or thirteen years prior to her death, devising to her all of his property. They had no children or nearer relatives than nieces and nephews.

In 1907 this old couple moved to Scottsville. They came from near Gainesville, in Allen county, Kentucky, and so did Dr. Pace. They were considerably older than Dr. Pace, but they had been great friends, and the main reason that Major Rickman moved to town was because his friend and physician had moved to town about a year before. It seems that Major Rickman regarded Dr. Pace as his best friend and on his deathbed exacted a promise from the doctor that he would look after and care for Mrs. Rickman, which the proof shows he faithfully did, beginning immediately upon Major Rickman's death.

In January, 1916, Mrs. Rickman executed a will by the terms of which she devised all of her property to Dr. Pace. On May 2, 1918, she executed a deed conveying her property to Dr. Pace. She had this deed recorded, and afterwards delivered it to Dr. Pace. In both her will and this deed, she mentions the long existing friendship of Dr. Pace, and that it is on that account that she is executing them. In St. Matthew xx, 16, it is written: "Is it not lawful for me to do what I will with mine own?" She evidently thought it was, for she had frequently stated that she expected to leave her property to Dr. Pace. Her intention to do so became a matter of such common knowledge that one of her nephews wrote her relative to the matter. She stated to a friend who read the letter that she had not done so, but guessed she would. Her condition in life was not to be envied. She had neither father, mother, brother, sister, child nor grandchild living. Her only kinspeople were her nephews and nieces, the appellants, of whom she said: "They have never paid much attention to me." She had sixteen nephews and nieces of her own, and of these there were but two who had ever visited her often enough to become sufficiently acquainted with her mental condition to testify in this case. Still, we were not favorably impressed by this deed to Dr. Pace, when the matter was first presented to us. When Mrs. Rickman made this deed she was 74 years old. Not then mentally strong, she soon thereafter became very infirm, both physically and mentally. Dr. Pace was her physician, also her business agent, and this dual confidential relation gave him splendid opportunity to wheedle and cajole this old woman into giving him her property, if he was inclined to do so. All the witnesses say that he had more influence over her than any one, and she said, when talking of making her will, that Dr. Pace had agreed to take care of her

as long as she lived, if she willed him her property. Ordinarily, the friend you have to buy will not be worth what you pay for him, no matter what that may be.

However, Mrs. Rickman was confronted by a condition, and not a theory. She was old, lonely and dependent. Those who should have been prompted by ties of consanguinity to nurture and care for her showed no such disposition. She had this property, worth probably $6,000.00, and if by the use of that she was able to provide herself with needed care and attention in her declining years, such an arrangement we should not hastily set aside. To do so would be equivalent to denying to the aged and infirm the right to use their property to procure for themselves that care and attention of which they then so sorely stand in need.

The proof shows that Dr. Pace arranged for some one to live with her. Of course, there were times when she was alone, but these were few and short, for he nearly always had some one with her. The last one he had there was Mr. B. Y. Young, and when asked about how the doctor cared for her, he said:

"As good as he could. He was always there when he was needed and would come when he wasn't called and see how she was getting along. In passing he would stop and see that she had anything she wanted, candy, fruit, and anything she wanted he saw that she got it. He sure was good to her."

Her grocer testified:

"A. Dr. Pace came to me and told me when she wanted anything I had to let Mr. Young have it and he would settle for it.

"Q. Why was Dr. Pace doing this for Mrs. Rickman, if you know?

"A. He said he had promised Mr. Rickman on his deathbed that he would look after the old lady, and he was trying to keep that promise."

Her pastor testified:

"She said Dr. Pace had been a very intimate friend of the family and their family physician and she thought she might not be able to look after her interest all the time and she knew that Dr. Pace would, and that her people had never paid much attention to her, so she wanted to will her property to

some one who she knew would look after her and care for her as long as she lived.''

Many other witnesses testified similarly. The evidence showed this care and attention continued until her death. She appreciated it, and endeavored to reward the doctor for it. The condition of her mind at the time she made this deed is questioned, but that her mind was then good appears to be established by the weight of the evidence. The chancellor so found.

"It is our rule not to disturb the finding of the chancellor upon a question of fact where the evidence is conflicting, and upon consideration of the whole case the mind is left in such doubt that we cannot say with reasonable certainty that the chancellor erred in his conclusion." Jones v. Tarry, 187 Ky. 700, 220 S. W. 523.

The judgment is affirmed.