## Mullins et al. v. Mullins et al.

(Decided April 23, 1929.)

104

GALVIN & TRACY and RALPH RICH for appellants.

M. L. HARBESON and JOHN 'H. KLETTE for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

The appellants Minford Mullins and Mary Mullins are the children of Robert R. Mullins, deceased, who died in Kenton county, Ky., in May, 1928, leaving his widow, Jennie Mullins, and these two infant children as his sole heirs at law. Robert R. Mullins left an estate valued at about $12,000. He owned two farms, one containing 84 acres and the other 100 acres. His other property consisted of household goods, live stock, farming implements and intangible personal property. By his will he left the 84-acre farm to his wife during her life, and the remainder to his two children. His household goods, farming implements, and live stock he left to his widow. He divided his 100-acre farm into two parts and left one part to his niece Rose Tattershall and the other part to his niece Ruby Bellows for life and at her death to her son, Edward Bellows. He left certain notes secured by mortgage to his sister, Elizabeth Williams, and the remainder of his personal property after the payment of his debts he divided equally among the widow, Jennie Mullins, his sister, Elizabeth Williams, and his brother, Alex Mullins.

The appellants contested the will on the ground that Robert R. Mullins did not have sufficient mental capacity to execute a will on the date of its execution. At the conclusion of the testimony offered by appellants the court sustained a motion of appellees for an instruction directing the jury to return a verdict in favor of the will. The sole question before us is whether the trial court committed error in thus instructing the jury.

At the time of his death Robert R. Mullins was about 70 years of age. His daughter was 17 years of age, and his son about 20. The proof is conclusive that Robert R. Mullins was particularly affectionate towards his family, and his family was dutiful and affectionate towards him. It is also shown that one of the beneficiaries, Ruby Bellows, although a niece, had not been intimately associated with him for many years, and in fact they had not seen each other for 15 years. She had visited in the neighborhood some months prior to his death, but she did not call on him and he did not call on her. There is nothing to show that the testator even knew the son of Ruby Bellows. Mrs. Tattershall, the other niece who is beneficiary, had not seen her uncle for more than 12 years prior to 1926 but in the summer of that year, and the following year, she called to see him, and again a short while before his death she visited him. His brother and sister, who are beneficiaries under the provision of the will, called to see him occasionally.

The proof shows that he died of cancer of the stomach; his health had not been good for a long time; he had a severe attack of influenza about 10 years prior to his death, from which he never completely recovered; he had a paralytic stroke, or at least it is so described by his widow, and as a result thereof he was near death for several months; thereafter he was able to go about his business, but he was in failing health and suffered as the result of "queer spells"; he was not left to himself when he went to the field to work and generally one of the children remained with him; he was never normal after he had the severe spell of illness; at times he was very quiet and appeared to be worried about something; he imagined he had enemies when he never had any; he would get up of a morning and speak to no one and would leave the house without addressing any of the family; he would return in a very talkative mood; he would wake up in the night talking about his enemies; he had severe spells of headache at least once a week; he walked about in the fields apparently shunning the company of other people; he slept a good deal in the daytime while sitting in his chair and would often fall asleep in the midst of a conversation; sometimes he would sleep all day; he often said that he was going crazy from a severe headache, and asked his wife what she would do with him if he should go crazy; he was obsessed with an idea that there was going to be a war and

he refused to spend money to purchase necessaries for the family, saying that he must save his money for the war; he conceived the idea that neighbors were stealing his corn; he thought a silo was sitting on the foot of his bed and insisted that he could see it sitting there until a light was made in the room and he could see nothing was on the foot of his bed, but he insisted that it had been there; he claimed that burglars were in the house and had crossed his bed, insisting that they had raised a window and crossed his bed and that he could hear them at his desk; after he was unable to do the milking he conceived the idea that the family desired to sell the cows and he would talk about it and sob like a child; he would forget that he had discussed a subject a day or two before and would discuss it fully again from time to time; he was weak physically; at times he would be vociferous in taking one side of a question and again he would be equally vociferous in favor of the other side; at times he grew hysterical while talking; he told his wife often that he expected her to look after the grave-yard when he was dead, but he left it in the care of another, by his will, residing some distance away; he said, both before and after making the will, to numerous witnesses that he was going to leave all his property to his wife, and that he expected her to divide it equally among the two children; he said to a number of witnesses that he was going to leave all of his property to his children, and that he wanted the 100-acre farm to remain in the name of his son, as it had been in the Mullins family for more than 100 years; he made these statements about the disposition of his property both before and after the execution of the will; he repeatedly cautioned his wife to be careful in the expenditure of the money which he should leave; he requested his son to look after the farms for himself and his sister and to be good to his sister.

It is urged that as he left a small estate that the will is unnatural in its provisions in that it made no sufficient provision for the maintenance of his wife and infant children. In the case of Newcomb v. Newcomb, 96 Ky. 120, 27 S. W. 997, 16 Ky. Law Rep. 376, it was held that when the provisions of a will are reasonable, provident, and natural they are high evidence of testamentary capacity, and that they may be submitted to the jury for the purpose of sustaining the paper, and that when the provisions of a will are irrational, unreasonable, and unnatural such provisions may be shown as

elements of testamentary incapacity and mental imbecility.

In the case of Harrel v. Harrel, 1 Duv. (62 Ky.) 204, this court held that, where there is no reason suggested for gross inequality among the natural objects of his bounty, such gross inequality may be considered in determining the question of mental capacity. In such cases—that is, where there is unaccountable gross inequality—there should be clear and satisfactory proof of a free, deliberate, and disposing mind before such a paper shall be established as a true and valid will.

In the case of McDonald v. McDonald, 120 Ky. 211, 85 S. W. 1084, 27 Ky. Law Rep. 607, 117 Am. St. Rep. 579, this court said: "It is as necessary, in order to have testamentary capacity, for one to have such sensibilities as will enable him to know the obligations he owes to the natural objects of his bounty, as it is for him . . . to know the nature and value of his estate, and a fixed purpose to dispose of it."

Where the provisions of a will are irrational and unnatural, these provisions may be considered by the jury along with other evidence in the determination of the question of mental incapacity. This court is committed to the doctrine of testatorial absolutism and has long adhered to that doctrine. We do not mean to depart from any of the opinions heretofore written on that subject, but this court has been more liberal than the courts of some jurisdictions in the admission of evidence relating to the mental incapacity of the testator. As was recently said by the assistant professor of the Cornell Law School in discussing this question: "So Kentucky speaks in consonance with common sense. There is promise that this test, which courts can apply with the appeal may gain currency." This quotation is taken from a paper entitled "The Right Of A Testator To Pauperize His Helpless Dependents." He has that right if at the time he does it he is mentally sound, knows his estate, the nature and value of it, has a fixed purpose as to its disposition, and of his own free will and accord makes such a disposition as will pauperize his helpless dependents. But the unnatural act in so doing may be considered as evidence by a jury in determining whether he was mentally competent to make a will at the time he put into execution his unnatural act.

The numerous statements of Robert R. Mullins as to his testamentary intentions, both before and after the

execution of the paper, were competent for the same purpose. In the case of Wall v. Dimmitt, 114 Ky. 923, 72 S. W. 300, 24 Ky. Law Rep. 1749, this court held that statements and declarations of a testator either made before or after the execution of the will are not competent as direct and substantive evidence of undue influence, or to show that the will was produced thereby, "but are admissible to show the mental condition of testator at the time of the making of the will, and her susceptibility to influences by which she was surrounded at the time."

In the case of Atherton v. Gaslin, 194 Ky. 460, 239 S. W. 771, this court said that there is little, if any, dissent from the rule that the declarations of the testator are admissible on the issue of mental incapacity. The same rule was announced in the cases of Wilson v. Taylor, 167 Ky. 162, 180 S. W. 45, and McFarland v. Ewing, 186 Ky. 829, 218 S. W. 271. The text-writers are in harmony that the rule announced by this court on this subject is the correct one.

It is urged that the evidence of the witnesses tending to establish mental incapacity is entitled to little or no weight. The witnesses were largely members of the family and of the household, including neighbors who were intimately acquainted with testator. They had an opportunity to observe him from day to day and they were entirely familiar with his speech, actions, and general conduct. No expert evidence was introduced. These witnesses could not testify as experts, but they were entitled to testify about the speech, acts, and conduct of the testator, and to express their opinion based on this personal knowledge. Probably the leading case on this question is Brown v. Com., 14 Bush (77 Ky.) 398. The conclusions expressed in that case have been reaffirmed from time to time. Wise v. Foote, 81 Ky. 12; Newcomb v. Newcomb, 96 Ky. 120, 27 S. W. 997, 16 Ky. Law Rep. 376; Fitzgerald v. Fitzgerald, 201 Ky. 813, 258 S. W. 681; Beatty v. Caldwell, 210 Ky. 559, 276 S. W. 547. But it is argued by counsel for appellees that such evidence is not competent unless the facts testified to by the witness upon which the opinion is based are reasonable within themselves to induce or support the opinion or deduction of the witness. It is true that the mere expression of opinion by a non-expert witness without showing any facts upon which the opinion is based would have little weight. Young's Ex'r v. Toliver, 214 Ky.

769, 284 S. W. 389; Wigginton's Ex'r v. Wigginton et al., 194 Ky. 385, 239 S. W. 458.

If the facts detailed by the witnesses on which they base their opinions simply show acts or conduct not out of line with the course of acts and conduct usually pursued by mankind, the opinion of the witnesses would be overcome by the statement of facts on which the opinion was based, and would be worthy of little or no consideration. Wood v. Corcoran, 190 Ky. 621, 228 S. W. 32; Langford v. Miles, 189 Ky. 515, 225 S. W. 246.

The facts detailed by the witnesses offered by appellants in this case do not show normal conduct or actions on the part of the testator. They are out of harmony with a well-ordered life. The facts detailed in this opinion, and we do not set out all of them, speak for themselves. On the whole case we have reached the conclusion that appellants made a case that should have been submitted to the jury for determination.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.