## McCrocklin's Adm'r et al. v. Lee et al.

(Decided Jan. 20, 1933.)

SHACKELFORD MILLER, Jr., and PETER, LEE, TABB, KRIEGER & HEYBURN for appellants.

MARK BEAUCHAMP and WALTER ALT for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

Mary Lee McCrocklin died January 21, 1930; a paper dated November 18, 1921, was probated as her will; a contest was filed; the contestants were successful; and the administrator with the will annexed has

appealed. The paper in question contains some minor bequests, and then provides:

"I give and devise, as a perpetual trust unto the Episcopal Orphan Asylum for Girls, the official title of which is the Protestant Episcopal Orphan Asylum of Louisville, the residue of my estate of every character and wherever situated, the income arising therefrom to be used to educate, support and maintain the girls of said institution."

Mrs. McCrocklin was about 72 years of age when this will was executed, she was a widow, was childless, her father and her mother were dead, and, if she were intestate, those who would take her property (about $24,000) are: Her brother George W. Lee would take one-sixth; the five children of her brother Joseph Lee would take one-sixth; the four children of her brother Wm. K. Lee would take one-sixth; Olivia Lee Dean, the only child of her brother Charles E. Lee, would take one-sixth; Walter K. Lee, only child of her brother Harry Lee, would take one-sixth; and the two children of her sister Fannie Lee Sale would take one-sixth.

The attack on this paper is based upon alleged mental incapacity and undue influence. Upon the latter feature the evidence was so weak it was not submitted to the jury, and the only question submitted was mental capacity. For reversal, the contestees urge the reasons which we shall state in the course of this opinion.

### Rulings Upon the Evidence.

There is little to complain of on this score; the court allowed a question to be asked Mrs. Florence L. Phillips concerning the relatives of Mrs. McCrocklin and their devotion to her that was too leading, and allowed the cross-examination of Virtle McGinity to go to an unwarranted extent and to go into unnecessary personal matters.

### The Sufficiency of the Evidence.

This is the principal question in the case and about the only one discussed in the briefs.

Mrs. McCrocklin married twice. She was divorced from her first husband, and later she married Isaac McCrocklin, with whom she lived upon her farm on Floyd's fork in Jefferson county until his death in 1915. She continued to live on her farm until the end of the

year 1918, when she sold it and moved into her former home at No. 2708 Grand avenue, Louisville, Ky. The proceeds of the sale of her farm she invested and managed until her death. She lived in a quiet way upon the income from these investments. She lived about 11 years after her return to Louisville, interesting herself in the children of the neighborhood, of whom she was very fond, and in raising chickens. During a part of this time a young woman named Mary Biggert (now dead) lived with her as a helper and companion for a few years, and later another young woman (Virtle McGinity) took her place and remained with Mrs. McCrocklin until the old lady died, a period of about 4 years.

Mrs. McCrocklin was somewhat eccentric, and these eccentricities are the bases of the attack on her mental capacity. She was nervous, easily startled, and frequently would interrupt a conversation to ask, "Who was that who passed the window?" On going to the window, they found no one had passed, and that the old lady was mistaken. The old lady's eyesight was not good, and perhaps she mistook some passing shadow for some one passing the window, and this view of the matter is suggested by the entire absence of evidence that she persisted in her opinion after being assured she was mistaken. All of us are mistaken at times, but a sound mind will abandon its erroneous convictions upon receipt of evidence of the mistake, whereas an unsound mind will persist in its error in spite of evidence.

In her second widowhood she had a young man at work for her on the farm, and there is some evidence she was in love with him and expected to marry him, and she gave some manifestations of her interest in him by seating him in the place of honor at the table, and there is evidence that she sought to get other men (peddlers) interested in her by recounting what she had and asking if she would not make some man a good wife. This was normal and natural rather than otherwise. There was evidence of similar conduct upon the part of the testator in Gambill v. Gambill, 236 Ky. 491, 33 S. W. (2d) 325, and it was held that such was perfectly natural.

There was evidence that she would sometimes miscall the names of her relatives when they visited her.

She called one witness Joe, the name of his father, and, when told his name was Bert, she responded, "Oh, yes Bertie." A niece testified that sometimes Mrs. McCrocklin would know her and sometimes she would not. Another niece testified Mrs. McCrocklin visited her, and, while they were eating lunch and were talking, that all at once Mrs. McCrocklin did not know her, so the niece told her name and her father's name; Mrs. McCrocklin looked at her for a while, and then went on talking. It is not shown when this occurred, and it appears to have been only momentary absentmindedness. She had one niece who was deaf and dumb, and sometimes Mrs. McCrocklin would forget she was deaf. A sister-in-law of Mrs. McCrocklin testified that often when she visited her she would call her "Miss Speed." All of these witnesses who testify to Mrs. McCrocklin's misnaming them belong to Joe Lee's family. Other witnesses do not mention this, and possibly this may be due to some lack of cordiality with that family or that her visits with or from them were infrequent.

She bought a pony and cart, and one of her nieces says she gave it to her and afterwards made. her bring it back, another witness says she gave it to everyone of the family, but perhaps what the old lady considered loans of the pony and cart they mistook for gifts. They so treated it any way, and sent or took the pony and cart back.

There was some evidence Mrs. McCrocklin was afraid of her stepson Hoke McCrocklin; there is some indication in the record this man was insane, but that was not proven. Any way, it was not shown that these fears were not well founded.

It was Mrs. McCrocklin's practice to show to her visitors the family pictures, although they had often seen them, but in the day and generation to which Mrs. McCrocklin belonged that was a rather usual custom.

The old lady asked a witness to see that her husband's cane, which she herself had used for years, was buried with her. That was a matter of sentiment, just like a Mason wants his apron buried with him, a Catholic wants a crucifix in his coffin, or a woman wants her wedding ring left on her finger.

Mrs. McCrocklin kept a pistol in her house; she frequently showed that weapon, and explained her

ability and readiness to use it. Living alone as she did, she perhaps felt the need of such a weapon, and thought it wise to do what she could to spread abroad notice that she had it. To another woman she spoke of how she wanted to be prepared for burial, that she wanted a pistol in each hand, and wanted her eyes left open. This was rather fantastic and unusual, but it is no evidence her mind was unsound.

She patronized peddlers, and would buy from them and frequently quite liberally, but there is no evidence she bought anything she did not need, except at one time she bought $15 worth of flavoring extracts, which does appear to be an unusual quantity, but there is no evidence she did not use it.

She allowed a book agent to induce her to subscribe for some sort of a medical book for $25, but her sister-in-law induced her to refuse to take it, but later she bought another and paid $18 for it. Her eyesight was so bad she could not read it, her hearing was bad, so it could not be read to her, and this does appear to be an unwise purchase, but she had the money, she wanted it, and it would hardly do to say one was mentally infirm because he bought a book from a book agent.

She would sometimes bring her little chickens in the house and put them and the old hens with them in a box under the kitchen table. She started on a visit to her niece for the purpose of seeing her newborn baby, and got lost and was crying. As her eyesight was poor, it may have been because she could not read the numbers on the houses that she got lost. Witnesses testify Mrs. McCrocklin wore an "awful lot of clothes," but it was the custom formerly in the age to which she belonged for women to wear more clothes than now.

She was forgetful, and would in conversation speak of something again that had been spoken of shortly before and in the same conversation.

She had often declared her intention to leave her money in the Lee family both before and after the execution of the paper in question, but she also said, "People will be surprised when my will is read," and in the only other will that it is known she made she left none of her property to her brothers or her sister, but gave it all to the wife of her brother George.

As she lived alone, she had a sort of alarm system

constructed by having cowbells placed on some sort of mounting at each door so that when the door was opened these bells would be set in motion and give an alarm. She kept the outside doors of the house locked, but many people do that. She told a neighbor she was 105 years old and talked about getting married. Another witness said she would drink and curse; that when she was in the country she would take off her clothes and go about in the house naked; that after she came to town she played with the children of the neighborhood when they visited her. She was fond of children, and kept candy to give to them, and one of her nieces says she put moth balls in this candy, and another says it tasted like moth balls and she would not let her children eat it. There was some evidence she lost some money farming, that in the latter part of her life on the farm she was not careful about looking after the farm work, counting up the work done, etc., but this was in 1918, farm hands were scarce, and would leave for the slightest thing, so perhaps her course was the wisest to follow under the circumstances.

She professed to be able to talk to her father and mother both long since dead, said her mother always brought her bad luck and her father brought her good luck, and this is urged as evidence of mental derangement. This does seem unusual, but many distinguished men have declared their conviction that communication of the living with the dead is more or less possible; among such are: Wm. E. Gladstone, four times premier of England; A. J. Balfour, another premier of England; Sir Oliver Lodge, an English scientist; Wm. Crookes, an English chemist and physicist; Caesare Lombroso, an Italian criminologist and author; Camile Flammarion, a French astronomer; Giovani Schiaparelli, noted for his writings on the planet Mars; Conan Doyle, the novelist; A. R. Wallace, the naturalist; Wm. James, the psychologist; Alfred Tennyson, the poet; R. L. Stevenson, the novelist; and others.

Hence that belief is no evidence of mental infirmity. See Franzman's Ex'rs v. Nalty, 208 Ky. 686, 271 S. W. 1034, and Nalty's Adm'r v. Franzman's Ex'r, 221 Ky. 709, 299 S. W. 585. We discussed a similar claim in McPerkin v. Com., 236 Ky. 528, 33 S. W. (2d) 622.

More than 40 years ago Mrs. McCrocklin executed a will devising everything she had to the wife of her

brother George and gave it to her. There was certainly a very close friendship, if not some business connection between the two. Later Mr. George Lee and his wife went to live with Mrs. McCrocklin, they stayed but a short time, something happened that disturbed the cordial relations between them, anyway they left, and Mrs. George Lee kept that will, and Mrs. McCrocklin was after that afraid to eat anything Mrs. George Lee had cooked, and that is urged as evidence of mental derangement. There is not enough proof to make it so. We do not know what happened which caused the rupture of the relations between Mrs. McCrocklin and Mr. and Mrs. Geo. Lee.

Contestants placed great reliance upon what they term the evidence of experts; that is, upon the evidence of two doctors and a nurse. One of these was Dr. Thomas S. Wallace, who testified he treated Mrs. McCrocklin through an attack of bronchial pneumonia in 1919. This is taken from his evidence:

"Q. Doctor, when you were called in, did you observe, in addition to her physical condition, her mental condition? A. Her mental condition at that time was not pronounced. I wish to change that statement. I did not pay any attention to her mental condition at that particular time. * * *

"Q. When did you first observe her mental condition? A. Subsequent to 1921. * * *

"Q. You say that was in 1921 that you observed that? A. Yes, sir. Subsequent to 1921, yes."

Later he said:

"1921 was the year in which I noted her mental peculiarity. * * * Previous to the time that I have specified, in 1921, I couldn't make a statement about that, because I didn't really pay any attention to it. Subsequent to that I did * * * When I first noted it was in 1921. I made a particular note of that."

Later he was asked and answered this question:

"Q. Doctor, just in order to refresh your memory, I will ask you if you can recall whether or not that occasion when you first noticed that in 1921 was the early part of 1921 or the latter part of 1921? A. I couldn't be positive about that."

**38**

Here are other questions and answers by him:

"Q. What was the trouble at that time that you noted? A. She was complaining about her relatives persecuting her. She wanted to keep a revolver in the house, and she said that she was afraid to leave the place, because they would break in and take everything she had—and statements of that kind.

"The Court: That was in 1921? A. In 1921 and subsequent. * * *

"Q. Now in 1921 you heard her speak about her relatives, and she talked to you as if she was under the impression that they were after some of her money? A. That is the statement she made to me. * * *

"Q. When you first noticed in 1921 this feeling against her relatives, that was in a very mild form, wasn't it? A. In 1921; yes, sir.  ·· .

"Q. And do ·you know whether or not she had any basis for that? A. I do not. * * *

"Q. Do you know whether or not she had loaned relatives, different ones, any money at different times that was not repaid? A. She made some statements in regard to lending money, but I don't recollect a great deal about it. * * *

"Q. Doctor, do you mean that in 1921 she didn't have mind enough to know her relatives, to know what estate she had, to know what people had claims upon her bounty, and enough mind to dispose of her estate according to a fixed purpose of her own? A. I don't believe that anybody that has a mania is capable of doing anything just as it ought to be done, mentally. Everything is subjected to that one particular condition—that mental condition. * * * Everything else is sidetracked for that one idea—that one mental idea. She had a mania about her relatives.

"Q. And in 1921, that was in a mild form? A. Yes, it was beginning then, as I noted it."

We wonder what opportunity the doctor had to make these observations, for he testified this illness was in 1919, that she recovered from it in a short time, and resumed her normal duties, and had no further

serious illness until 1928. The doctor has no records for 1919, 1920, or 1921; there is not a line of evidence he saw Mrs. McCrocklin in the year 1920 or 1921, except his statement he noticed this in 1921. He does not say he saw her professionally or otherwise in 1921, or that he saw her at all until he was called in by the young lady who was taking care of her to give her some advice about her digestion and bowels, and minor troubles. This was necessarily after 1921, because the services of these young women did not begin until some time after 1921.

He does not say she did not know her relatives in 1921; the fair inference from his answer is she did know them, but had the idea they were after her money, this he regarded as a mania. He does not say she did not know her estate, their claims upon her, or that she did not have mind enough to dispose of it according to a fixed purpose of her own, except for what he termed a mania on the subject of her relatives. His evidence does not show there was not a basis for this feeling on the part of Mrs. McCrocklin or that he tried to disabuse her mind of the idea and was unable to do so. All men have their likes and dislikes, but it is only when men entertain such without cause therefor that such may be said to be insane delusions, and to constitute insane delusions they must be persisted in, in spite of efforts and evidences offered to remove them. 40 Cyc. 1015.

There is plenty of evidence in this record that the old lady had basis for the belief her relatives were after her money.

She made a will in 1891 devising her property to Sadie Lee, gave her the will, and she yet has it, and has made it the basis of a suit against Mrs. McCrocklin's executor.

Bert Lee has a claim that all this property was to be willed to him, and has some evidence to support it.

Mrs. Effie Lee Johnson testified the old lady asked her to name her baby for her, and promised her to educate the child, dress her, and leave a codicil in her will for her. The old lady perhaps did so, for this appears at the foot of this will in this record:

"The rest of this page was destroyed by me.

"July 16th 1926.  Mary Lee McCrocklin."

She paid for Bert Lee's education and clothed him.

She let Mrs. Duvall's husband have $500. She gave Mrs. Johnson's son a $100 bond. She gave Mrs. Johnson $300 to pay on her home. Dr. Wallace was doubtless paid by Mrs. McCrocklin for his services, perhaps by a check, she had mind enough for that, but according to him not enough to make a will. Ed Potts worked for her on the farm, her mind was good when contracting with him, but according to him not good when it came to making her will. Mr. Francis rented land from her, yet he thought her mind was weak, and it seemed like business was dull with her, so he says.

Two Misses Wenzel testify the old lady's mind was not right, yet they admit they went over there practically every afternoon and played cards with her, that she was nice to them, they found her interesting, and they liked her very much, and their mother allowed these children to visit the old lady and encouraged them to do so.

Dr. M. C. Brumley did not see Mrs. McCrocklin professionally, but only as a neighbor, he testified her mentality was bad, very bad, but the only basis he had for his conclusion is that in conversation she would inquire about people or something, and in perhaps ten minutes do so again. That is not enough. Few men have perfect memories. Many men tell the same anecdotes over and over again to the same listeners. Sometimes men ask the same question again in the hope of getting more complete or fuller answers. Sometimes lawyers do this in the examination of witnesses. There was not sufficient basis for the doctor's conclusion.

The other expert witness was Mrs. Philipps, a nurse. She says Mrs. McCrocklin was erratic, was frivolous in her ways, and she refused to eat some broth prepared for her by Mrs. Sadie Lee; then she was asked and answered this question:

"Q. Do you think she had sufficient mind to dispose of that estate according to a fixed and determined purpose of her own? A. I don't think she had, owing to the way she disposed of it."

The court ruled out this answer, but it shows the basis of her subsequent answer: "I would not." The whole sum and substance of her evidence is Mrs. McCrocklin did not have mind enough to make a will be-

cause she did not make the sort of a will the witness thought she should make.

Against all this there is the evidence for the contestees that Mrs. McCrocklin was in full possession of her faculties, she managed her business, invested and re-invested her money, there is no evidence she ever lost a dime in so doing; the witnesses for the contestees say nothing of the eccentricities concerning which the witnesses for the contestants testify. The old lady managed her own business, collected the returns on her investments, attended to the purchase of her necessary household supplies, gave her checks in settlement therefor. When she ran short of money, she would borrow $100 or some such sum until her income came in, then would pay it. She attended to the needed repairs on her house and paid therefor. Her stepson Horace McCrocklin lived with her from 1920 until 1924. He testifies she was a perfectly normal person. He did not know when she made the will, but she told him she was leaving her property to the orphan asylum. When asked the usual question about her having mental capacity to make a will on November 18, 1921, he answered, "Absolutely she did." Mrs. Tang was a member of the same church as Mrs. McCrocklin; she knew her for about 7 years before her death; she saw her at church, at lawn fetes and different things the church had, visited her in her home about once a month, that she was a learned woman and all right in every way.

Mr. Decker lived two doors from Mrs. McCrocklin, became acquainted with her about 1925 or '26, he visited her frequently, mowed the grass and weeds for her, did gardening, put up screen doors for her, and did other odd jobs, for which she paid him, and he testifies her mental condition was all right, and he never noticed anything about her different from other people.

Mr. Gardner, the deputy assessor, knew Mrs. McCrocklin from 1919 to 1927, was a member of same church, saw her at church, at suppers, parties, and things at the church, and she was a perfectly normal person.

The grocer with whom she traded and his clerk both testify they knew Mrs. McCrocklin for 10 or 11 years before her death, that she was in the store every

day or so, made her purchases and gave her checks like any one else, and they regarded her mental condition as fine.

Mrs. McKenzie testified she was, after July, 1919, the vault keeper at the bank where Mrs. McCrocklin had a box rented, that she would come there once or twice a month, and often alone, for about 10 years, would sign her name, give her box number, etc., just as other people, that she frequently talked with her, and found her an intelligent normal woman.

Virtle McGinity, who lived with her the last 4 years of her life, testified Mrs. McCrocklin managed her household, attended to her chickens, gave her own checks, and in every way conducted herself as a normal person during the first 2 years she was there, that she had a severe illness in 1928, from which she never fully recovered.

The paper in question was witnessed by M. S. Kohler and Shackelford Miller; the latter being a former member of this court and the scrivener of the will.

It is argued that, because the old lady asked Mrs. Johnson if her father (Mrs. McCrocklin's brother) was living, therefore she did not know the objects of her bounty, but in Evenson v. Rust, 152 Wis. 113, 139 N. W. 766, a will was upheld, although it contained a devise of property to a brother who was dead when the will was made. Mere weakness of mental power will not render a person incapable of executing a will. It is not necessary that he should be competent to make contracts or transact business. Old age and failure of memory do not of themselves necessarily take away a testator's capacity to dispose of property. Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55.

In Speer v. Speer, 146 Iowa 6, 123 N. W. 176, 27 L. R. A. (N. S.) 294, 140 Am. St. Rep. 268, two witnesses saw the testator the day the will was executed, but not at the time of its execution. They testified to his physical weakness, his failure to recognize them, and his apparent inability to converse as to his condition or as to his affairs, yet the will was upheld.

In Waters v. Waters, 222 Ill. 26, 78 N. E. 1, 3, 113 Am. St. Rep, 359, the will was upheld, although there was this evidence in the record:

"She would frequently commence saying something, and then change it a little, and turn off into something else, and sometimes refer to it again as if she had not been talking about it."

A will was upheld, although the court in the opinion said of the testator:

"At the time the will was executed he was 75 years old, was weak and feeble, and had been quite ill with inflammatory rheumatism. He was afflicted with catarrh, which affected his head, back, and spine; and was so nervous that it was difficult for him to raise any liquid to his mouth without spilling it. He was absent-minded and irritable, and his memory had failed him to quite an extent, particularly so after his rheumatic attack." In re Cline's Will, 24 Or. 175, 33 P. 542, 543, 41 Am. St. Rep. 851.

In Frazie's Ex'x v. Frazie, 186 Ky. 613, 217 S. W. 668, a judgment rejecting a will was reversed with directions for a peremptory instruction, although there was evidence the testator could not keep his mind on one subject.

In Williams v. Davis, 192 Ky. 433, 233 S. W. 886, a will was upheld although there was evidence the testator's memory was bad.

The case of Mullins v. Mullins, 229 Ky. 103, 16 S. W. (2d) 788, is cited and relied on by contestants, but the facts there are very different from the facts here. That will was made about a month before Mullins died, and made a disposition of his property so unnatural as to give some evidence of lack of mental capacity.

Contestants cite section 4850 of Ky. Stats., which provides that the same effect shall be given to the verdict of a jury in a will case as in other civil cases, but that does not mean that such a verdict may not be set aside for lack of evidence to support it. The contestants have a vast number of witnesses who testify to many things, but no one of the things amount to anything, and the sum of them all is still little, if anything. This old lady's attention appears to have been called to this will three times at least: When she made it, when she made the codicil, and when she destroyed the codicil. It reflects her settled purpose as to her property.

44

Courts guard jealously the rights of all people including the aged when not imposed on to make wills and contracts, for, as pointed out by this court in Petty v. Pace, 207 Ky. 592, 269 S. W. 713, it is often the only means they have when old to get the care and attention they then so sorely need.

We might adopt in this regard the language of Chancellor Kent, and say:

> "It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life, to command the attentions due to his infirmities." Van Alst v. Hunter, 5 Johns, Ch. (N. Y.) 148.

After reading this evidence, one may conclude the old lady was eccentric, but there is no support for the conclusion that she was crazy. It is extremely doubtful if there is here any more than a bare scintilla of evidence to take this case to the jury, and no one can find in the record any support for its verdict. When a verdict cannot be reasonably explained by what is in the record, then it is reasonable to assume that it is the result of the operation in or upon the minds of the jury of some prejudice or other thing outside of the record, and such a verdict is flagrantly against the evidence.

Judgment reversed.